**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SYBERSOUND RECORDS, INC.,
　　　　　　*Plaintiff-Appellant,*

v.

UAV CORPORATION, doing business
as Karaoke Bay doing business as
Sterling Entertainment; MADACY
ENTERTAINMENT LP, doing business
as Karaoke Party; AUDIO STREAM,
INC., doing business as Keynote
Karaoke; TOP TUNES, INC.; SINGING
MACHINE COMPANY, INC.; BCI
ECLIPSE COMPANY, LLC; AMOS
ALTER; DAVID ALTER; EDWARD
GOETZ; DENNIS NORDEN; FRANK
ROBERTSON; DOUGLAS VOGT;
RICHARD VOGT,
　　　　　　*Defendants-Appellees.*

No. 06-55221

D.C. No.
CV-05-05861-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
October 18, 2007—Pasadena, California

Filed February 27, 2008

Before: Diarmuid F. O'Scannlain and Milan D. Smith, Jr.,
Circuit Judges, and Michael W. Mosman,* District Judge.

*The Honorable Michael W. Mosman, United States District Judge for the District of Oregon, sitting by designation.

1673

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Peter L. Haviland and Julian Brew, Kaye Scholer LLP, Los Angeles, California, for the plaintiff-appellant.

Paul N. Sorrell, Lavely & Singer Professional Corporation, Los Angeles, California; Daniel A. Johnson, Sullivan Johnson LLP, Los Angeles, California; Robert A. Aronson, Beverly Hills, California, for the defendants-appellees.

**OPINION**

MILAN D. SMITH, JR., Circuit Judge:

Sybersound Records (Sybersound), a karaoke record producer, appeals the district court's judgment dismissing the first amended complaint (FAC) it filed against its competitors (collectively, Corporation Defendants), and their officers and employees (collectively, Individual Defendants). We affirm the judgment of the district court.

In this appeal, we determine whether a party lacking standing to bring a copyright infringement suit under the Copyright Act, but who complains of competitive injury stemming from acts of alleged infringement, may bring a Lanham Act claim, Racketeer Influenced and Corrupt Organizations Act (RICO) claim, or related state law unfair competition claims, whose successful prosecution would require the litigation of the underlying infringement claim. We hold that it cannot.

We also consider whether the transfer of an interest in a divisible copyright interest from a copyright co-owner to Sybersound, unaccompanied by a like transfer from the other copyright co-owners, can be an assignment or exclusive license that gives the transferee a co-ownership interest in the copyright. We hold that it cannot.

## I.  Factual Background

### A.  Copyright Compliance Statements

Sybersound and the Corporation Defendants are competitors that produce and sell karaoke records. They primarily sell to a group of distributors and retailers that resell these records to the public. This purchasing group (collectively, Customers) includes Anderson Merchandising, Handleman Entertainment Resources, Alliance Entertainment Corporation, Wal*Mart, KMart, Best Buy, Toys "R" Us, and Fry's Electronics.

According to Sybersound, to reproduce and distribute karaoke records, karaoke record producers must obtain karaoke synchronization licenses from each copyright holder with an interest in each song included on the record. The Customers require that the karaoke records they buy be 100% licensed. To comply with the Customers' policies, sellers of karaoke records must obtain copyright licenses from and pay fees and full royalties to each of the copyright owners. Some Customers have instituted measures to ensure compliance with their licensing requirements. For example, in 2003, Handleman required its vendors to sign an indemnification agreement in which each vendor "represents that it has all the appropriate and necessary licenses in order for Handleman to sell Vendor's merchandise to Handleman's customers." The following year, Handleman began requiring that each karaoke vendor annually provide a written certification that it has acquired karaoke licenses from each copyright holder and that "each such license is current, valid and paid in full to the date of the opinion letter." Similarly, Anderson requires its vendors to provide written documentation that its karaoke recordings are fully licensed and that vendors are accurately reporting sales and accounting for royalties.

Sybersound alleges that the Corporation Defendants misrepresent to the Customers that their karaoke records are 100% licensed and that all applicable royalties have been paid. Specifically, Sybersound alleges that its competitors claim to have all necessary licenses when they hold only compulsory licenses, licenses from less than 100% of the copyright holders, or no licenses at all. It further alleges that the Individual Defendants have, on various occasions, admitted that they intentionally failed to acquire the appropriate licenses for their karaoke recordings.

Sybersound also alleges that Madacy and Singing Machine use misleading labeling on their karaoke records which state, for example, that all songs are "used with permission" or that

"The Singing Machine, The Leader in Home Karaoke, strictly adheres to all applicable music copyright and licensing laws."

Finally, Sybersound alleges that UAV and Madacy's licensing agent sent a letter to the Customers and publishers falsely claiming that Sybersound did not have karaoke-use licenses for many songs included in its recordings.

## B.   Sybersound's Copyright Infringement Claim

Sybersound also claims that UAV, Madacy, Audio Stream, Top Tunes, and BCI are infringing Sybersound's copyrights in several songs by producing karaoke records of these songs without obtaining a license from Sybersound or its copyright assignor, TVT Music Publishing (TVT). Sybersound claims to have acquired an ownership interest in these songs by entering into a written agreement with TVT, an original co-claimant[1] to the copyright of these songs. This written agreement allegedly made Sybersound an "exclusive assignee and licensee of TVT's copyrighted interests for purposes of karaoke use, and also the exclusive assignee of the right to sue to enforce the assigned copyright interest." According to Sybersound, the copyright holders of these songs had an understanding that each could license only his or her respective shares and that a duly authorized karaoke recording would require a written license from each.

## II.   Procedural Background

Sybersound, along with six music publishing companies, filed a complaint against the Corporation Defendants, alleging copyright infringement, violation of the Lanham Act, intentional interference with prospective economic relations, unfair competition under California Business and Professions Code

---

[1]A copyright claimant is either the "author of the work," or the "person or organization that has obtained ownership of all rights under the copyright initially belonging to the author." 37 C.F.R. § 202.3(a)(3).

§ 17200 et seq., common law unfair competition, unfair trade practices under California Business and Professions Code § 17000 et seq., and seeking rescission and an accounting. The district court severed the music publishing plaintiffs from the suit and dismissed the claims for rescission of licenses and an accounting without prejudice. The Corporation Defendants then filed motions to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted these motions, dismissing the remaining claims with leave to amend.

Sybersound then filed a FAC that included most of the alleged causes of action pled in the original complaint, but also added claims against the Individual Defendants for violations of RICO, 18 U.S.C. § 1962(a), (c). The Corporation Defendants and the Individual Defendants (collectively, Defendants) filed motions to dismiss the FAC for failure to state a claim. The district court granted these motions, dismissing all claims with prejudice, and entered final judgment for the Defendants.[2] Sybersound timely appealed.

## III. Standard of Review and Jurisdiction

Dismissals for failure to state a claim are reviewed de novo. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Generally, the review is limited to the consideration of the complaint, and all allegations of material fact are construed in the light most favorable to the nonmoving party. *Id.* Dismissal is appropriate only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim entitling plaintiff to relief." *Id.* (citations omitted). "This court can affirm the district court's dismissal on any ground supported by the record, even if the district court did not rely on the ground." *Id.* at 950 (citations omitted).

---

[2]Defendants Madacy, Amos Alter, and David Alter filed a motion to stay or dismiss the FAC based on international comity and forum non conveniens arguments. The district court denied this motion as moot.

We have jurisdiction under 28 U.S.C. § 1291.

## IV.   Discussion

## A.   Lanham Act Claim

The Lanham Act § 43(a)(1) states in pertinent part:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A)  is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act § 43(a)(1), 15 U.S.C. § 1125(a)(1).

[1] The Lanham Act was intended to protect against the "deceptive and misleading use of marks" and to "protect persons engaged in . . . [interstate] commerce against unfair competition." 15 U.S.C. § 1127; *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (2003). Section 43(a), 15 U.S.C.

§ 1125(a), "is one of the few provisions [of the Act] that goes beyond trademark protection" and addresses unfair competition. *Dastar*, 539 U.S. at 29. This provision, however, "does not have boundless application as a remedy for unfair trade practices" and is not a "federal 'codification' of the overall law of 'unfair competition' . . . but can apply only to certain unfair trade practices prohibited by its text." *Id.* (citations omitted).

Sybersound contends that the Corporation Defendants engaged in unfair competition by violating copyright laws, thereby paying less in royalties and licensing fees to produce their products than Sybersound did to produce its own, and by misrepresenting their compliance with the Customers' licensing policies, which permitted them to sell pirated records at prices that undercut Sybersound's own prices. Furthermore, representatives of UAV and Madacy purportedly sent letters or made statements to the Customers accusing Sybersound of also failing to obtain the requisite licenses for its re-recordings. Sybersound contends these are misrepresentations under § 43(a)(1)(B) of the Lanham Act because they are made in commercial advertising or promotion to the Customers and the misrepresentations are about the "nature, characteristics, [and] qualities" of the karaoke records.

**[2]** Sybersound claims that it is contesting only the Corporation Defendants' misrepresentations in response to the Customers' policies. According to Sybersound's own description of copyright law in the context of karaoke synchronization licenses, however, the Customers' policies parallel the licensing agreements that exist in the recording industry and are a mechanism for the Customers to ensure that the products they sell comply with copyright law. The nature of the alleged misrepresentation exposes a tension between the Lanham Act's goal of preventing unfair competition and the Copyright Act's goal of providing a statutory scheme granting rights only to copyright owners.

**[3]** Copyright is wholly a "creature of statute, and the only rights that exist under copyright law are those granted by statute." *Silvers v. Sony Pictures Entm't*, 402 F.3d 881, 883-84 (9th Cir. 2005) (en banc). Under copyright law, only copyright owners and exclusive licensees of copyright may enforce a copyright or a license. *See* 17 U.S.C. § 501(b) (conferring standing only to the "legal or beneficial owner of an exclusive right" who "is entitled . . . to institute an action for any infringement . . . while he or she is the owner of it"); *Silvers*, 402 F.3d at 885. Therefore, third party strangers and nonexclusive licensees cannot bring suit to enforce a copyright, even if an infringer is operating without a license to the detriment of a nonexclusive licensee who has paid full value for his license. *See* 3-10 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 10.02 [B][1] (2007).

The reasoning behind the Supreme Court's decision in *Dastar*, 539 U.S. 23, is instructive in resolving the issue before this court because it addressed the tension between the Lanham Act and the Copyright Act. *Id.* at 33-35.

In *Dastar*, a film company copied a television series that had passed into the public domain, and marketed it as its own. *Id.* at 27-28. Production companies that owned the exclusive television rights from the original book on which the series was based brought a Lanham Act suit, claiming that the lack of attribution to the original series misrepresented the "origin" of the series. *Id.* The Court held that "origin of goods" in the Lanham Act § 43(a)(1)(A) did not refer to the author of any idea, concept, or communication embodied in a good, but to the producer of the tangible good itself. *Id.* at 37. Otherwise, the Lanham Act would provide authors of creative works with perpetual protection that they did not have under the Copyright Act. *Id.*

In dicta, the Court further noted that if the film company had misrepresented, in advertising or promotion, that the contents of the video were significantly different from the series

that it copied, it would have a Lanham Act claim for misrepresenting the "nature, characteristics [or] qualities" of its goods. *Id.* at 38.

**[4]** Sybersound argues that the licensing status of each work is part of the nature, characteristics, or qualities of the karaoke products. Following the reasoning in *Dastar*, however, to avoid overlap between the Lanham and Copyright Acts, the nature, characteristics, and qualities of karaoke recordings under the Lanham Act are more properly construed to mean characteristics of the good itself, such as the original song and artist of the karaoke recording, and the quality of its audio and visual effects. Construing the Lanham Act to cover misrepresentations about copyright licensing status as Sybersound urges would allow competitors engaged in the distribution of copyrightable materials to litigate the underlying copyright infringement when they have no standing to do so because they are nonexclusive licensees or third party strangers under copyright law, and we decline to do so.

**[5]** Accordingly, we affirm the district court's dismissal of Sybersound's Lanham Act claims.

## B.  Copyright Infringement

Sybersound's second cause of action alleges that UAV, Madacy, Audio Stream, Top Tunes, and BCI infringed Sybersound's copyrights in nine songs. Sybersound asserts standing to sue as a co-owner in the copyrights for those songs.

Sybersound bases its copyright infringement claim on the following reasoning: TVT is an original co-claimant or joint copyright holder (co-owner) in nine songs. Such co-owners are like tenants in common, each owning a share of the undivided whole. H.R. Rep. No. 94-1476, at 121 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5736 ("Under the bill, as under present law, coowners of a copyright would be treated generally as tenants in common, with each coowner

having an independent right to use or license the use of a work, subject to a duty of accounting to the other coowners for any profits."). Sybersound contends that it stepped into TVT's shoes and became a co-owner in the karaoke-use interest of the copyright when it became the "exclusive assignee and licensee of TVT Music Publishing's copyrighted interests for purposes of karaoke use, and also exclusive assignee of the right to sue to enforce the assigned copyright interests, for both present and past infringements in karaoke exploitation" pursuant to an assignment agreement with TVT. Citing 17 U.S.C. § 201(d)(1), Sybersound asserts standing to sue, as a co-owner, for copyright infringement against the Corporation Defendants that use any of the nine referenced copyrighted songs for karaoke purposes without having obtained a license from Sybersound or TVT. *See* 17 U.S.C. § 501(b); *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) (co-owners may bring suit for copyright infringement without joining other co-owners).

Sybersound's analysis is flawed because, as a co-owner of the copyright, TVT could not grant an exclusive right in the karaoke-use interest of the nine referenced copyrights.

Prior to the current 1976 Copyright Act, under the 1909 Copyright Act and the doctrine of indivisibility, a copyright owner could not assign less than " 'the totality of rights commanded by copyright.' " *Gardner v. Nike, Inc.*, 279 F.3d 774, 778 (9th Cir. 2002) (quoting 3-10 Nimmer, *supra*, § 10.01[A] (2001)) (a copyright owner possessed a bundle of rights that could not be assigned in parts). "Anything less than an assignment was considered to be a license," and only the copyright owner or assignee had standing to bring an infringement action. *Id.*

**[6]** The 1976 Copyright Act largely eliminated the doctrine of indivisibility and codified the divisibility of the bundle of rights that constitutes a copyright.[3] 17 U.S.C. § 201(d)(2); *Sil-*

---

[3]A copyright consists of a bundle of six statutorily created rights, currently codified at 17 U.S.C. § 106. The statute confers upon the owner of

*vers*, 402 F.3d at 886. However, 17 U.S.C. § 201(d), entitled "Transfer of Ownership," codified this divisibility as follows:

(1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

(2) Any of the *exclusive* rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. *The owner of any particular exclusive right* is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d) (emphasis added). Next, 17 U.S.C. § 101 defines "transfer of copyright ownership" as "an assignment,

---

the copyright the exclusive right to do and authorize the following:

(1)  to reproduce the copyrighted work in copies or phonorecords;

(2)  to prepare derivative works based upon the copyrighted work;

(3)  to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4)  in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5)  in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6)  in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

*Id.*

mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a *copyright or any of the exclusive rights comprised in a copyright . . . but not including a non exclusive license*." 17 U.S.C. § 101 (emphasis added). "In other words, exclusive rights may be chopped up and owned separately, and each separate owner of a subdivided *exclusive* right may sue to enforce that owned portion of an exclusive right, no matter how small." *Silvers*, 402 F.3d at 887 (emphasis added).

If TVT were the sole copyright owner of the nine referenced songs and had transferred an exclusive karaoke-use interest to Sybersound (assuming such a divisible interest exists), Sybersound would have had standing as the exclusive licensee to sue the Corporation Defendants for infringement. However, even if a karaoke-use is a properly divisible interest in a copyright, TVT is not the exclusive owner of the karaoke-use interest in the copyright. In its Request for Judicial Notice filed concurrently with its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Madacy attached copies of copyright registration records from the United States Copyright Office showing that EMI Music Publishing, Ltd., Beyonce Publishing, Scott Storch Music, Careers-BMG Music Publishing, Inc., Xtina Music, Logrhythm Music, and others, are all co-owners of the copyrights in one or more of the nine assigned songs. Thus, unless all the other co-owners of the copyright joined in granting an exclusive right to Sybersound, TVT, acting solely as a co-owner of the copyright, could grant only a nonexclusive license to Sybersound because TVT may not limit the other co-owners' independent rights to exploit the copyright. *See Oddo v. Ries*, 743 F.2d 630, 633 (9th Cir. 1984). Sybersound does not allege that it has received the consent of the other co-owners to become the exclusive licensee for the karaoke-use interest.

**[7]** Sybersound assumes that because its assignment agreement with TVT says that TVT is transferring all its karaoke-use interests in the copyrights to Sybersound, and says that

Sybersound became exclusive assignee of TVT's copyrighted interest in karaoke use and of TVT's right to sue, Sybersound became a co-owner upon execution of the agreement. Sybersound is mistaken. Although the 1976 Copyright Act permits *exclusive* rights to be chopped up and owned separately, to be effective, the assignment or other type of alienation permitted by 17 U.S.C. §§101 and 201(d)(2) must be *exclusive*. Since TVT's assignment was admittedly non-exclusive, TVT succeeded only in transferring what it could under 17 U.S.C. § 201(d), a non-exclusive license, which gives Sybersound no standing to sue for copyright infringement. *See* 3-10 Nimmer, *supra*, § 10.02 [B][1] (2007).

**[8]** We hold that because Sybersound is neither an exclusive licensee nor a co-owner in the nine copyrights, it lacks standing to bring the copyright infringement claims alleged in the FAC, and, thus, its copyright infringement claims fail.

## C.   RICO Claims

### 1) Statutory Standing

RICO provides a private right of action for "[a]ny person injured in his business or property" by a RICO violation. 18 U.S.C. § 1964(c). Sybersound seeks relief pursuant to RICO statutes, 18 U.S.C. § 1962(a) and (c). 18 U.S.C. § 1962(a) prohibits a person who receives income derived from a pattern of racketeering activity from using or investing such income in an enterprise engaged in interstate commerce.[4] 18

---

[4]Section 1962(a) states:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of a unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

U.S.C. § 1962(c) prohibits a person employed by or associated with any enterprise engaged in interstate commerce to conduct or participate in the conduct of the enterprise through a pattern of racketeering activity.[5]

Sybersound alleges that some of the individual executives of the Corporation Defendants engaged in racketeering in violation of § 1962(c) by engaging in the predicate acts of criminal copyright infringement, mail fraud, and wire fraud. Specifically, it alleges that the Individual Defendants engaged in copyright infringement by copying and distributing karaoke records for which they lacked licenses and did not pay royalties, and further engaged in mail and wire fraud by representing to the Customers via mail or fax that they comply with the Customers' policies.[6] Sybersound also seeks recovery under § 1962(a), alleging that the Corporation Defendants invested the proceeds from these predicate acts to unfairly reduce prices to undercut their competitors. Sybersound contends that it has met the standing requirements under 18 U.S.C. § 1962(a) and (c) because it is a competitor that has been directly injured by the resulting undercutting of its prices.

**[9]** In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68 (1992), the Supreme Court held that Congress intended the statute conferring a private right of action under RICO, 18 U.S.C. § 1964(c), to include a proximate cau-

---

[5]Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[6]Sybersound also alleged in the FAC that the letters sent by individuals at UAV and Madacy to Customers that falsely stated that Sybersound's karaoke records lacked the requisite licenses were acts of mail and wire fraud. Sybersound, however, failed to raise this argument in its brief, and we decline to reach the merits of this claim. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

sation requirement because the relevant language in the RICO statute mirrored that of the civil-action portions of the federal antitrust laws. *Holmes*, 503 U.S. at 267-68. It reasoned that at the time RICO was enacted, courts had interpreted the antitrust provision to include a proximate causation requirement. *Id.* Because Congress is presumed to know how the federal courts interpret its statutes, the Supreme Court concluded that Congress intended that the courts read a similar proximate causation requirement into RICO. *Id.*

Following the Supreme Court's analysis in *Holmes*, this court formulated three nonexhaustive factors to determine whether the RICO proximate causation requirement has been met:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002) (quotations and citation omitted). The district court dismissed Sybersound's RICO claim, reasoning that it had failed to overcome this proximate causation hurdle.

Sybersound argues that as a competitor injured by unlawful predicate acts, it is the quintessential RICO plaintiff that has suffered a direct injury. Furthermore, Sybersound claims that because of the small number of Customers involved, damages would not be difficult to ascertain because it can establish when it lost a contract to a competitor charging lower prices. It also claims that its injuries are separate and distinct from the injuries to the copyright holders, eliminating the risk of multiple recoveries.

The Supreme Court recently clarified the proximate causation requirement for a suit brought under § 1962(c), thereby foreclosing Sybersound's argument. *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006).

In *Anza*, National Steel Supply (National) failed to charge New York sales tax to its cash-paying customers and submitted fraudulent tax returns, which allegedly allowed it to undercut Ideal Steel Supply Corporation's (Ideal) prices. *Id.* at 1994-95. Ideal brought suit under RICO, 18 U.S.C. § 1962(a) and (c). *Id.* at 1995. The district court granted National's Rule 12(b)(6) motion to dismiss for failure to state a claim. *Id.* at 1995. The Second Circuit vacated the district court's judgment, holding that the plaintiff has standing "even where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff." *Id.* The Supreme Court reversed, holding that the attenuated harm suffered by Ideal did not meet the directness requirement laid out in *Holmes* as to the § 1962(c) claim. *Id.* at 1996.

**[10]** In reaching its conclusion, the Supreme Court considered the principles underlying the directness requirement. *Id.* at 1997-98. First, "[o]ne motivating principle is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action." *Id.* at 1997. The Supreme Court noted that defrauding the tax authority did not require National to lower prices, since lower prices may have resulted from, for example, a decision that "additional sales would justify a smaller profit margin." *Id.* Moreover, "Ideal's lost sales could have resulted from factors other than petitioner's alleged acts of fraud. Businesses lose and gain customers for many reasons . . . ." *Id.*

**[11]** Similarly in this case, the court would have to engage in a speculative and complicated analysis to determine what percentage of Sybersound's decreased sales, if any, were attributable to the Corporation Defendants' decision to lower

their prices or a Customer's preference for a competitor's products over Sybersound's, instead of to acts of copyright infringement or mail and wire fraud. *See id.* This case would require an even more speculative analysis than *Anza* because Sybersound has more than one principal competitor.

As noted by the Supreme Court,

> [t]he element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation. It has particular resonance when applied to claims brought by economic competitors, which, if left unchecked, could blur the line between RICO and the antitrust laws.

*Id.* at 1998. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to plaintiff's injuries." *Id.*

Second, "[t]he requirement of direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 1998. The Supreme Court noted that the direct victim, the state tax authority, could be expected to pursue National for its tax violations. *Id.* Here, as well, the more direct victims of the Corporation Defendants' alleged infringement actions, the copyright holders, can be expected to pursue their own claims. In fact, prior to the severing of their claims, six music publishers pursued their copyright infringement claims as part of this very action.

The third factor discussed in *Holmes* was the risk of multiple recoveries. *Holmes*, 503 U.S. at 269. *Anza* makes clear, however, this is not a necessary condition for concluding that proximate cause is lacking. *See Anza*, 126 S. Ct. at 1997-98 (acknowledging that there was no appreciable risk of duplicative recoveries).

**[12]** Following *Anza*, we hold that Sybersound cannot overcome the proximate causation hurdle to assert a RICO violation under § 1962(c).

## 2) Investment Injury

Sybersound has not alleged an investment injury separate and distinct from the injury flowing from the predicate act, as required for a RICO claim brought under § 1962(a).

**[13]** In *Nugget Hydroelectric, L.P. v. Pacific Gas and Electric Co.*, 981 F.2d 429, 437 (9th Cir. 1992), we held that a "plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income." In this case, Sybersound must allege that the investment of racketeering income was the proximate cause of its injury. Reinvestment of proceeds from alleged racketeering activity back into the enterprise to continue its racketeering activity is insufficient to show proximate causation. *See Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 829 (9th Cir. 2003), *overruled on other grounds*, *Odom v. Microsoft Corp.*, 486 F.3d 541, 551 (9th Cir. 2007) (en banc); *Westways World Travel v. AMR Corp.*, 182 F. Supp. 2d 952, 960-61 (C.D. Cal. 2001) (explaining that when racketeering is committed on behalf of a corporation, almost every racketeering act committed by a corporation would also result in a § 1962(a) violation because corporations generally reinvest their profits, eviscerating the distinction between § 1962(c) and (a)).

**[14]** Sybersound argues that it meets § 1962(a)'s investment injury requirement because it is the direct victim of the use of proceeds generated by the predicate acts. Its competitors used the proceeds from their copyright infringements and mail fraud to undercut Sybersound's prices. Sybersound, however, has not alleged any injury separate and distinct from the injuries incurred from the predicate act itself.

**[15]** Here, Sybersound's injury stems from the alleged copyright infringement. The purported infringement by the Corporation Defendants, not the income from the sale of pirated records, allegedly allowed the Corporation Defendants to undercut Sybersound's prices. Sybersound's reliance on *Simon v. Value Behavioral Health*, 208 F.3d 1073, 1083 (9th Cir. 2000), *overruled on other grounds*, *Odom*, 486 F.3d at 551, is unavailing. In that case, Value Behavioral Health fraudulently denied health benefit claims to patients and reinvested that income to build a group of preferred medical providers who undertook to eliminate outside providers. *Id.* The court, in dicta, noted that the victims of the investment were competitors who were driven out of business by the preferred providers. *Id.* There, the competitors in *Simon* would not have been injured by the predicate act of the fraudulent denial of health care benefits, but would have been directly injured by the reinvestment of the proceeds resulting from such denial. In contrast, Sybersound's competitive injury stems from the alleged copyright infringement for which it does not have statutory standing to bring a RICO claim.

**[16]** Accordingly, we hold that the district court properly dismissed Sybersound's § 1962(a) and (c) RICO claims.

## D.   State Law Claims

### 1) Preemption

Finally, Sybersound seeks relief under a variety of California state laws. The district court dismissed all state law claims, finding that they are preempted by the Copyright Act. It reasoned that the underlying basis of each of Sybersound's state law claims is that because the Corporation Defendants failed to obtain complete licenses for the songs they sell, they caused harm to Sybersound. It therefore concluded that the state law claims are "merely copyright claims dressed up to look like state law claims" and that the claims were not distinguishable from copyright infringement claims.

**[17]** The Copyright Act explicitly preempts state laws that regulate in the area of copyright, stating that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 . . . are governed exclusively by this title." 17 U.S.C. § 301(a). Copyright law does not preempt state laws with respect to "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." *Id.* § 301(b)(3). Traditionally, two conditions must be satisfied for a law to be preempted under the federal Copyright Act. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001). "First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Id.*

**[18]** In this case, the plaintiff lacks standing to bring a claim of copyright infringement under the federal copyright law. The cases cited by Sybersound to avoid preemption are inapplicable because they all involve plaintiffs who would have had standing under the federal copyright act, or who pursued non-infringement claims. *E.g.*, *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115 (N.D. Cal. 2001) (plaintiff asserted own copyright claim); *Rubin v. Brooks/Cole Pub. Co.*, 836 F. Supp. 909 (D. Mass. 1993) (same); *PMC, Inc. v. Saban Entm't, Inc.*, 52 Cal. Rptr. 2d 877, 885 n.8 (Ct. App. 1996) (gravaman of complaint was that defendant prevented plaintiff from finalizing a licensing deal), *overruled on other grounds*, *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 954 n.11 (Cal. 2003).

**[19]** The exclusive rights of copyright owners granted by Congress under § 106 of the Copyright Act may only be enforced by an owner or exclusive licensee of the right; allowing the litigation of these state claims would defeat Congress's intent to have federal law occupy the entire field of

copyright law. *See* 17 U.S.C. § 501(b); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 167 F. Supp. 2d 1114, 1125 (C.D. Cal. 2001). If we were to permit Sybersound's claims based on incidences of copyright infringement to proceed, Sybersound would be litigating a third party copyright infringement claim under the guise of state law; to prevail on either the infringement claim or the claim based on misrepresentations of whether infringement occurred, Sybersound would have to prove that copyright infringement occurred. Accordingly, the state law claims that necessarily depend on such a showing were properly dismissed.

We now turn to the remaining state law claims.

## 2) Intentional Interference with Prospective Economic Relations

Sybersound alleges that the Corporation Defendants intended to disrupt, and have disrupted, its business relationships with its Customers by engaging in the wrongful acts of misrepresenting to the Customers that the Corporation Defendants are paying all royalties required under their licensing contracts, and that Sybersound does not have valid licenses for its songs.

In California, the elements of the tort of intentional interference with prospective economic advantage are:

> (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional [wrongful] acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.

*Korea Supply Co.*, 63 P.3d at 950.

**[20]** As noted, to the extent an alleged wrongful act by the Corporation Defendants is based on copyright infringement, it is preempted.

Furthermore, Sybersound has failed to plead facts either showing or allowing the inference of actual disruption to its relationship with the Customers. *See Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1313 (N.D. Cal. 1997) (finding the pleadings insufficient where the complaint alleged only that the misrepresentations induced distributors not to deal with plaintiffs without providing facts alleging an actual disruption to negotiations or potential contracts). In its complaint, Sybersound merely states in a conclusory manner that it "has been harmed because its ongoing business and economic relationships with Customers have been disrupted." Sybersound does not allege, for example, that it lost a contract nor that a negotiation with a Customer failed.

**[21]** Accordingly, Sybersound's cause of action for tortious interference with prospective economic relations was properly dismissed.

### 3) Unfair Competition Law (UCL), California Business and Professions Code § 17200 et seq.

**[22]** California's statutory unfair competition laws broadly prohibit unlawful, unfair, and fraudulent business acts. *Korea Supply Co.*, 63 P.3d at 943. Unlawful acts are "anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made," where court-made law is, "for example a violation of a prior court order." *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 & n.22 (C.D. Cal. 2003) (quoting *Smith v. State Farm Mut. Auto. Ins. Co.*, 113 Cal. Rptr. 2d 399, 414 (Ct. App. 2001); *Saunders v. Superior Court*, 33 Cal. Rptr. 2d 438, 441 (Ct. App. 1994)) (internal quotations omitted). Unfair acts among competitors means "conduct that

threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). Finally, fraudulent acts are ones where members of the public are likely to be deceived. *Nat'l Rural Telecomm. Coop.*, 319 F. Supp. 2d at 1077-78.

In its FAC, Sybersound asserts that the "foregoing acts constitute unlawful, unfair and fraudulent business acts or practices within the meaning of Section 17200" and that it has "suffered injury in fact and has lost money as a direct result of the Defendants' violations of Section 17200." Even assuming that this constitutes a sufficiently detailed pleading, Sybersound has failed to state a claim.

[23] To the extent the improper business act complained of is based on copyright infringement, the claim was properly dismissed because it is preempted. What remains are claims based on the Corporation Defendants' alleged misrepresentations to the Customers that they are complying with policies requiring payment of royalties, misrepresentations to copyright holders that they are obtaining proper licenses from other co-owners and paying all royalties, and misrepresentations to the Customers that Sybersound is infringing copyrights.

[24] We first address the claims based on contracts and misrepresentations to which Sybersound was not a party, namely the misrepresentations to the Customers and copyright holders about payment of royalties and licenses, which sound in contract law. Under the sweeping standing provisions of California's UCL, "[s]ection 17200 does not require that a plaintiff prove that he or she was directly injured by the unfair practice or that the predicate law provides for a private right of action."[7] *Gregory v. Albertson's Inc.*, 128 Cal. Rptr. 2d

---

[7]Recently, Proposition 64 restricted UCL's standing requirement somewhat by requiring a private action be brought by "any person who has suf-

389, 392 (Ct. App. 2002). "[A] breach of contract may form the predicate for a section 17200 claim, provided it also constitutes conduct that is unlawful, or unfair, or fraudulent." *Nat'l Rural Telecomm. Coop.*, 319 F. Supp. 2d at 1074 (internal quotation and citation omitted). Sybersound, however, has not pled that the breaches of contract are independently unlawful, unfair, or fraudulent, merely that the Corporation Defendants do not pay royalties or acquire licenses from other co-owners, in breach of their contracts with licensors and the Customers.

Furthermore, allowing Sybersound to bring suit to essentially vindicate the rights of the copyright holders and the Customers would pose significant problems in administering the equitable remedy provided under the UCL. In its FAC, Sybersound requests "a preliminary and permanent injunction barring the Defendants from engaging in additional acts of unfair competition and for such restitution as permitted by law." It further states that "forcing Defendants to fully license their products will result in the enforcement of an important right affecting the public interest." Because the unfair competition claim is based upon the misrepresentations that occurred in separate business relationships among karaoke records producers, licensors, and the Customers, the court would be placed in the awkward situation of enforcing private contracts among sophisticated parties who are not all parties to this lawsuit. *See Gregory*, 128 Cal. Rptr. 2d at 396 (dismissing a UCL claim and noting that the specific remedy sought under the UCL would "cause the court to assume the roles of real estate broker or property manager . . . [and] require the court to make competitive business judgments." (internal quotation omitted)).

---

fered injury in fact and has lost money or property as a result of such unfair competition." Cal. Bus. & Prof. Code § 17204. Sybersound has alleged loss of money as a result of the Corporation Defendants' wrongfully acquired competitive advantage.

**[25]** In this case, forcing "Defendants to fully license their products" and enforcing sales and royalties contracts through this litigation may "leave victims worse off than they would be if they filed individual actions against [defendants]." *Rosenbluth Int'l, Inc. v. Superior Court*, 124 Cal. Rptr. 2d 844, 847 (Ct. App. 2002) (dismissing a UCL claim that was based on a contract where the public in general was not harmed by the defendant's unlawful practices, but where the victims of the unlawful actions were sophisticated corporations that negotiated their individual contracts with defendants). Courts are institutionally ill-suited to enforce and superintend private contracts among business entities where the concerned entities themselves are not parties to the suit.

Sybersound's allegations that UAV and Madacy falsely told the Customers that Sybersound's karaoke recordings infringed on copyrights also fail to state a claim. Since Sybersound cannot state a claim under the Lanham Act or the Copyright Act and has not pled any other unlawful acts under which this claim would fall, it cannot meet the unlawful conduct prong of the UCL. Moreover, Sybersound has also not pled an act that would be an incipient violation of antitrust law, as required under *Cel-Tech* for claims against competitors. Finally, Sybersound has not pled that these misrepresentations are likely to deceive members of the general public.

**[26]** Accordingly, we conclude that the UCL claim was also properly dismissed by the district court.

## 4) California Common Law Unfair Competition

**[27]** "The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another." *Bank of the W. v. Superior Court*, 833 P.2d 545, 551 (Cal. 1992) (explaining that the tort provided "an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection" and that the expansion

of unfair competition law is primarily based in statutes). Sybersound has not alleged that the Corporation Defendants have passed off their goods as those of another nor that they exploit trade names or trademarks and, thus, has not stated a common law unfair competition claim.

### 5) Unfair Trade Practices, California Business and Professions Code § 17000 et seq.

Under California Business and Professions Code § 17043, "[i]t is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, *for the purpose of injuring competitors or destroying competition*." Cal. Bus. & Prof. Code § 17043 (emphasis added).

The California Supreme Court has held that to violate this act, a generalized understanding or intent that particular conduct will injure competition is insufficient to state a claim; instead, the violator must act with the specific *purpose* of injuring its competition. *Cel-Tech Commc'ns*, 973 P.2d at 536 ("Section 17043 uses the word 'purpose,' not 'intent,' not 'knowledge.' We therefore conclude that to violate section 17043, a company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition.").

**[28]** Sybersound has not met this requirement. It alleges that the Defendants engaged in their behavior "knowing that their below-cost sales would undercut the prices of their competitors . . . and specifically intended to injure competitors . . . and to destroy competition." As noted, the intent to injure competitors is insufficient; Sybersound must allege that the Corporation Defendants' purpose was to injure Sybersound. Because it has not done so, this claim also fails.

### V.  Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.