Concurrence by JUDGE SACK.
SACK, Senior Circuit Judge,
concurring
in the judgment:
I agree that we must remand this case to the district court for further proceedings. I disagree, however, that the word “biographies” in the 1999 Agreement unambiguously includes the manuscript of the autobiography of DeVito ghost written by Corbello’s decedent Woodward for DeVito (“the Work”), completed some eight years earlier, and that the 1999 Agreement therefore transferred certain derivative rights in the Work to the counter-parties to the Agreement — Valli and Gaudio. First, I would conclude that the language is ambiguous under New York law and remand on that basis for the district court to decide as a matter of fact whether the 1999 Agreement included a transfer of rights with respect to the ghost-written autobiography. But second, even if the 1999 Agreement unambiguously transfers DeVito’s interest in the Work, I think Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir.2008), compels us to conclude that the transfer effected only a nonexclusive, rather than an exclusive, li *1069 cense to use the Work for “the creation of a musical stage play.”
I
The majority offers a plausible — but not the only plausible — reading of the language of the 1999 Agreement. Because the language at issue “is susceptible to more than one reasonable interpretation,” Brad H. v. City of New York, 17 N.Y.3d 180, 186, 928 NYS.2d 221, 951 N.E.2d 743, 746 (2011), I agree with the district court that the 1999 Agreement is ambiguous under New York law. I think the following account of why the 1999 Agreement does not include the transfer of or license in all or part of the Work is also reasonable:
The parties — DeVito/Nicholas “Massi” Macioci,[1] on the one side, and Valli/Gaudio on the other — entered into the 1999 Agreement to “authorize the creátion of a musical stage play based on the life and music of ‘The Four Seasons,’ ” the singing group of which all four were members, and the story of which ultimately was reflected in the highly successful musical “Jersey Boys.” The 1999 Agreement explains that “the authors of the play [anticipated by the 1999 Agreement] may wish to use or incorporate certain aspects of your [i.e., DeVito’s and Macioci’s] life related to The Four Seasons including, by way of example, your creative contributions, biographies, events in your life, names and likenesses (the ‘Materials’).” (Emphasis added). DeVito and Macioci accordingly granted to Valli and Gaudio “the exclusive right to use and incorporate the Materials in one or more theatrical productions.”
In other words, Valli and Gaudio purchased from DeVito and Macioci the right to use “certain aspects” of their lives, a category that is then illuminated by several “example[s],” including “biographies.” In this light, and taking the document as a whole as we must, S. Rd. Assocs., LLC v. Int'l Bus. Machs. Corp., 4 N.Y.3d 272, 277, 793 NY.S.2d 835, 826 N.E.2d 806, 809 (2005), the term “biographies” is perhaps most naturally read to refer to a “[p]ersonal history,” or “the events or circumstances of a person’s life, viewed collectively.” Oxford English Dictionary (3d ed.2010), available at www.oed.com/view/ Entry/19219.[2] “[Biographies,” like “names and likenesses,” may constitute aspects of both DeVito’s and Macioci’s lives, rather than particular recordings of their lives.[3] This reading does not, as the majority suggests, Maj. Op. at 1062-63, threaten to offend the canon against superfluity. *1070 “[T]he events or circumstances of a person’s life, viewed, collectively ” are, by definition, distinct from the events or circumstances themselves. A collective viewing may entail characterizing events to form a trajectory or story arc, rather than a mere collection of individual events.
Another definition of the word “biography,” moreover, suggests that the parties did not necessarily intend to include the Work in the rights granted under 1999 Agreement. A “biography,” or “bio,” may (and in my experience in being asked for a “biography” or “bio” in connection with some panel discussion, moot court, or the like, very often does) refer to “a brief summary of a person’s life and work.” Oxford English Dictionary (3d ed.2010), available at www.oed.com/view/Entry/ 19187; see also, e.g., Doe v. Merck & Co., 283 A.D.2d 543, 543, 725 N.Y.S.2d 356, 357 (2d Dep’t 2001) (discussing a pharmaceutical company’s educational brochure “which contained photographs and biographies of HIV-positive individuals”); Charney v. Sullivan & Cromwell LLP, 15 Misc.3d 1128(A), 841 N.Y.S.2d 217 (N.Y.Sup.Ct.2007) (discussing a law firm website’s use of “biographies of [certain partners], which list the partners’ clients and some of the deals they have worked on”). This type of “brief summary,” which a playwright might well draw upon, does not seem to me to envision or require a manuscript of a detailed biography that is hundreds of pages long.
In the absence of the manifestation of a contrary intent among the parties, it may be preferable to apply either of the foregoing definitions, rather than those referring to written manuscripts, which might inappropriately enlarge the general category of “aspects of your life.” ‘When a particular class [i.e., “aspects of your life”] is spoken of, and general words [i.e., “biographies”] follow, the class first mentioned is to be taken as the most comprehensive.” Bers v. Erie R.R. Co., 225 N.Y. 543, 546, 122 N.E. 456, 457 (1919) (internal quotation marks omitted). Indeed, as a general matter, we should be “extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.” Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 385 N.E.2d 566, 572 (1978).
In short, the word “biographies” has here at least three plausible meanings, only one of which covers the Work. And the majority’s preferred reading is not the only one that makes sense. See Maj. Op. at 1063-64. The purpose of the 1999 Agreement was to facilitate the creation and production of a theatrical work based on DeVito’s or Macioci’s life story. Having transferred his right in a. single kind of derivative work, DeVito may well have sought to retain the right to publish or otherwise distribute other accounts of his life through books, film, or other media. Cf. 17 U.S.C. § 106 (listing, beside the right to prepare derivative works, the copyright owner’s rights to reproduce, distribute copies of, publicly perform, publicly display, or transmit the copyrighted work). If under these circumstances, however, DeVito creates a theatrical production based on his life, he runs afoul of the 1999 Agreement and may be liable to Valli and Gaudio.
In this context, leaving the Work outside the scope of the 1999 Agreement makes a great deal of practical sense. Having said nothing in the Agreement explicitly about the Work, which had been in existence for more than eight years, DeVito remained and remains free to do with his autobiography (subject of course to his obligations to the widow of Woodward, the person who actually wrote it) what people normally try to do with their memoirs (if anything): He can publish it, distribute copies, sell it, *1071 read excerpts at public events, license movies and audiobooks, and so on, all -without worrying about breaching the Agreement. However, if and only if he attempts to create a play or other theatrical work based on his manuscript, he would be hard-pressed to do so without including events in his life, his life story, etc. He might then be hable to Valli and Gaudio under the Agreement for encroaching on the rights he gave them.
I would, therefore, agree with the district court that the contract’s language is ambiguous. I think that court erred, however, in admitting extrinsic evidence to interpret the contract’s ambiguous language. The question of ambiguity is a question of law to be resolved by the court, but “[i]f there is ambiguity in the terminology used, [ ] and determination of the intent of the parties depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, then such determination is to be made by the jury.” Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909 (1973). I would remand this case to the district court for trial.
II
Assuming, despite the foregoing discussion, that the 1999 Agreement does unambiguously include the Work (or were a jury to find the Agreement includes the Work despite the Agreement’s facial ambiguity), the question arises: What kind of interest in the Work does the 1999 Agreement transfer to Valli and Gaudio? The majority concludes that the Agreement confers an exclusive license or assignment. Maj. Op. at 1066. I think Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137 (9th Cir.2008), compels the conclusion, however, that the Agreement would then confer a nonexclusive license.[4]
In that case, TVT Music Publishing, a co-owner of the copyright of certain songs, attempted to make Sybersound, a karaoke record producer, the “exclusive assignee and licensee of TVT’s copyrighted interests for purposes of karaoke use, and also the exclusive assignee of the right to sue to enforce the assigned copyright interest.” Id. at 1142 (internal quotation marks omitted). The other original co-owners of the copyright, several record companies, did not join in granting rights to Sybersound. Id. at 1146. When other karaoke record producers used songs under license from TVT to Sybersound without Sybersound’s permission, Sybersound brought suit against the producers for infringement. Id. at 1142. This Circuit affirmed the district court’s dismissal of the complaint, concluding that Sybersound lacked standing to sue third-party infringers. Id. at 1146.
I agree with the majority’s analysis of Sybersound except to the extent it concludes that DeVito was legally capable of transferring to Valli and Gaudio an exclusive license of any kind or description. According to Sybersound, one co-owner of a copyright cannot confer an exclusive license on a licensee because she or he has no exclusive right to confer. Sybersound, 517 F.3d at 1146 (“[Ujnless all the other co-owners of the copyright joined in granting an exclusive right to Sybersound, TVT, acting solely as a co-owner of the copyright, could grant only a nonexclusive license to Sybersound because TVT may not limit the other co-owners’ independent rights to exploit the copyright.”) This conclusion may be in tension with other elements of copyright law, as the majority *1072 avers, Maj. Op. at 1065-66, but courts and commentators appear to be in universal agreement that Sybersound stands for the proposition that “a co-owner of a copyright cannot unilaterally alienate [its] share of the intellectual property and instead can ‘only grant a nonexclusive license’ to a third party.” Brownmark Films, LLC v. Comedy Partners, 800 F.Supp.2d 991, 996 (E.D.Wis.2011) (quoting Sybersound, 517 F.3d at 1146), aff'd on other grounds, 682 F.3d 687 (7th Cir.2012); see also, e.g., Amaretto Ranch Breedables v. Ozimals Inc., 907 F.Supp.2d 1080, 1084 (N.D.Cal.2012) (similarly reading Sybersound).
The facts of Sybersound are in an important respect indistinguishable from those before us. Here, as in Sybersound, a single co-owner (here, DeVito; there, TVT) of a particular interest attempted to grant an exclusive license to use a particular part of the co-owner’s derivative work right (here, the right to create a derivative theatrical work; there, the right to create a derivative karaoke record) to third parties (here, Valli and Gaudio; there, Sybersound). Here, as in Sybersound, the single co-owner attempted to effect this transfer without the consent of the other co-owner(s) (here, Corbello; there, the record companies).
Sybersound seems to me to mean that the transfer from DeVito to Valli and Gaudio, like the transfer from TVT to Sybersound, effected a nonexclusive license. DeVito, like TVT, “succeeded only in transferring what [he] could under 17 U.S.C. § 201(d), a non-exclusive license.” Sybersound, 517 F.3d at 1146. This application of Sybersound does not “limit a co-owner’s ability to transfer unilaterally any exclusive copyright interests that he himself possesses.” Maj. Op. at 1066. It does no more than recognize that DeVito had no exclusive copyright interest in the derivative-work right to a theatrical production to transfer in the first place. Therefore, Valli and Gaudio had a nonexclusive license, and Corbello’s sole accounting remedy lies against DeVito. See 2 William F. Patry, Patry on Copyright § 5.9 (2014) (“Where only one joint author grants a nonexclusive license, the nongranting joint author may not obtain an accounting from the nonexclusive licensee since that licensee is not a joint copyright owner. Instead, the nongranting joint author must obtain the accounting from the granting joint author.”).
Commentators have expressed some dissatisfaction with this aspect of Sybersound’s holding.[5] As a three-judge panel, we of course are bound by circuit precedent.[6] Miller v. Gammie, 335 F.3d 889, 899 (9th Cir.2003) (en banc). Nor can we ignore the substantial similarity between the facts of Sybersound and those of this case. We are, in my view, required to treat Valli and Gaudio’s copyright interest as a nonexclusive license.[7] Just as this *1073 Court rejected Sybersound’s claim against those who used karaoke versions of songs contrary to Sybersound’s purported exclusive right to do so because the purported licensor (TVT) had no right to grant such exclusive use to Sybersound in the first place, we should reject the plaintiffs accounting claim against Valli and Gaudio.
Ill
In sum, then, I would decide that the contract is ambiguous as to whether the Work is included within the Materials. Because the contract is ambiguous, the district court erred by determining the meaning of the contract on the basis of parol evidence at summary judgment. I would therefore remand to the district court for further proceedings. But it would vastly simplify matters, I think, if in that case the district court first decided the defendants’ summary judgment motion arguing that Jersey Boys does not infringe the Work as a matter of law in any event, see, e.g., Funky Films, Inc. v. Time Warner Entm’t Co., L.P., 462 F.3d 1072, 1076-77 (9th Cir.2006), an issue which it previously avoided by granting summary judgment on contract grounds, Corbello v. DeVito, 844 F.Supp.2d 1136, 1154-55 (D.Nev.2012). That might be the end of the matter as far as “Jersey Boys” Valli and Gaudio are concerned irrespective of the difficult issues that the majority and we address here.
Even if the 1999 Agreement unambiguously included the Work, as the majority conclude, I would decide that DeVito granted Valli and Gaudio only a nonexclusive license to use the Work toward a theatrical production. Corbello’s accounting action properly lies, then, against DeVito, not Valli and Gaudio, and the latter action must be rejected.

. Nicholas "Massi” Macioci, an early member of "The Four Seasons,” was also a signatory to the 1999 Agreement. He died in 2000, Nick Massi, Low Man in the Four Seasons, Dies at 73, N.Y. Times, Jan. 8, 2001, http:// www.nytimes.com/2001/0 l/08/national/08 MASS.html, however, and has no role in the current litigation.

. I would hesitate to give dispositive effect to the order in which dictionary editors choose to rank their definitions, Maj. Op. at 1062. Cf. Mastrovincenzo v. City of New York, 435 F.3d 78, 107 (2d Cir.2006) (Sack, J., concurring in part and dissenting in part) ("I am generally reticent to invoke dictionary definitions, at least in contexts perhaps unforeseen by their [anonymous] writers.”). In any event, I note that the first listed definition in Merriam-Webster’s refer to a biography as "usually” written, suggesting that there are other appropriate uses of the term. Merriam-Webster's Collegiate Dictionary (11th ed.2003), available at http://www.merriam-webster. com/dictionary/biography.

.It may be worth noting, in this connection, that as far as we are aware there was no written Macioci biography or autobiography ever produced the rights to which could have been included, although as a one-time member of the group, he was likely mentioned in DeVito's ghost-written autobiography. Insofar as Macioci’s "biography” is concerned, then, it would seem likely that "biography” meant the story of his life.

. We are in accord, however, that the 1999 Agreement confers the right to use the 'Materials’ to create only one type of derivative work, a theatrical production, Maj. Op. at 1064; the only question is whether that right is exclusive or nonexclusive.

. For criticism of Sybersound, see Amaretto Ranch Breedables v. Ozimals Inc., 907 F.Supp.2d 1080, 1084 (N.D.Cal.2012) (citing III Goldstein on Copyright § 15.5 (3d ed.2011); 4 Nimmer on Copyright § 6.10[A][2][d] (rev. ed.2012); 2 Patry on Copyright § 5:103 (2012)), in which it was noted that the district court there had to, as we must, follow Sybersound nonetheless.

. The majority correctly observes that the circuit's pr^-Sybersound precedent supports the conclusion "that copyrights are divisible and that a copyright owner can freely transfer any portion of his ownership interests in that copyright.'' Maj. Op. at 1064. But Sybersound reasoned that those ownership interests are limited in the case of a co-owner, who "is not the exclusive owner” of the copyright and thus can transfer only a nonexclusive license. Sybersound, 517 F.3d at 1146.

.I would reject the district court's apparently newly coined term "selectively exclusive license.” The court’s description of the practical effects of DeVito's failed attempt to transfer an exclusive license seems to me correct under Sybersound. But, under the prin *1073 ciple of numeras clausus, I would avoid risking the creation of a new form of copyright interest. See Thomas W. Merrill & Henry E. Smith, Optimal Standardization in the Law of Property: The Numerus Clausus Principle, 110 Yale L.J. 1, 3-4 (2000). If we were to fully describe the transaction between DeVito and Valli and Gaudio, which we need not do in this case, I think that transaction is better described in terms of an already existing form of copyright interest (a nonexclusive license), plus a contract-based promise by DeVito not to re-license the same rights to anyone else.