**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

VERICOOL WORLD, LLC,

*Plaintiff - Appellant*,

v.

IGLOO PRODUCTS CORP.,

*Defendant - Appellee.*

No. 24-192

D.C. No.
4:22-cv-02440-
HSG

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted September 19, 2025
San Francisco, California

Filed May 6, 2026

Before: David F. Hamilton, Ryan D. Nelson, and Patrick J.
Bumatay, Circuit Judges.[*]

Opinion by Judge R. Nelson;
Dissent by Judge Bumatay

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the
Court of Appeals, 7th Circuit, sitting by designation.

## SUMMARY**

### Lanham Act

The panel affirmed the district court's grant of summary judgment in favor of Igloo Products Corp. in a false advertising action brought under the Lanham Act by Vericool World, LLC, a cooler manufacturer.

Vericool alleged that Igloo wrongfully took credit as the first to market a biodegradable cooler.

The panel held that even though Vericool World, LLC, was founded years after the statements that allegedly injured its predecessor Vericool, Inc., it had standing to sue as an assignee of Vericool, Inc.

The Lanham Act, 15 U.S.C. § 1125(a)(1)(B), creates a cause of action against a defendant who "misrepresents the nature, characteristics, qualities, or geographic origin" of a good. The panel held that the "characteristic" must be an observable aspect of the tangible product, rather than the ideas or communications that goods embody or contain. Accordingly, when a plaintiff brings a false advertising claim based purely on statements that cause confusion about which product was the first on the market, that plaintiff does not have a valid claim under § 1125(a)(1)(B). The panel held that Vericool's claim was not cognizable because it concerned the origin of an idea embodied in its coolers, rather than the characteristics of the product itself.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel concluded that Vericool waived its assertion, made for the first time on appeal, that Igloo's "first to the market" claim caused confusion about whether Vericool's cooler was biodegradable.

Dissenting, Judge Bumatay wrote that Vericool alleged a material misrepresentation under the Lanham Act because the "nature," "characteristics," or "qualities" of a thing includes its intangible or non-observable nature, characteristics, or qualities. So when Vericool manufactured what it considered to be the first biodegradable cooler and then sued Igloo Products for falsely advertising that Igloo created the original biodegradable cooler, Vericool alleged a material misrepresentation under the Lanham Act. Because Vericool adequately alleged a material misrepresentation under the Lanham Act based on its "first of its kind" assertion, the panel should have remanded to the district court to determine whether Vericool meets the other elements of a false advertising claim.

---

## COUNSEL

Andrew Grimm (argued), Digital Justice Foundation, Omaha, Nebraska; Gregory W. Keenan, Digital Justice Foundation, Floral Park, New York; James Banker, Digital Justice Foundation, Las Vegas, Nevada; Felton T. Newell Jr., Newell Law Group PC, Los Angeles, California; Leeron Kalay, Fish & Richardson PC, Redwood City, California; for Plaintiff-Appellant.

Tim D. Byron (argued), Byron Raphael LLP, San Francisco, California; Jordan Raphael, Byron Raphael LLP, Los Angeles, California; for Defendant-Appellee.

---

**OPINION**

R. NELSON, Circuit Judge:

Vericool World LLC, a cooler manufacturer, claims Igloo Products Corporation said something uncool— wrongfully taking credit as the first to market a biodegradable cooler.  We must decide whether Igloo's statements are unlawful under the Lanham Act.  The Lanham Act creates a cause of action against a defendant who "misrepresents the nature, characteristics, qualities, or geographic origin" of a good.  15 U.S.C. § 1125(a)(1)(B). The "characteristic" must be an observable aspect of the "tangible product" rather than the "ideas or communications that 'goods' embody or contain." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31–33 (2003). Because Vericool's claim concerns the origin of an idea embodied in its coolers—rather than the characteristics of the product itself—we conclude it is not cognizable under the Lanham Act.  We affirm the district court's grant of summary judgment.

I

In 2016, Vericool Inc. (the predecessor to Vericool World LLC)[1] started manufacturing "green" alternatives to Styrofoam coolers.  In 2017, Vericool released its first fully

---

[1] Unless otherwise noted, "Vericool" refers interchangeably to Vericool Inc. and Vericool World.

biodegradable cooler, the "Vericool III," made of molded plant pulp. Retail stores did not sell the Vericool III. Vericool's shift into the consumer market came a year later, when it started selling its "Ohana" cooler directly to consumers.

Meanwhile, Igloo launched its own biodegradable cooler—the "Recool"—in 2019. The Ohana and the Recool have many similarities. Like the Ohana, the Recool is made of molded plant pulp. The development timelines of the two products are also similar. Igloo claims that it began researching its ecofriendly alternatives to Styrofoam coolers in 2015, and developed a prototype by early 2017. Unlike the Ohana, however, Igloo sold the Recool in major retail chains, including REI, Target, and Walmart.

This case concerns statements Igloo made promoting its new product. Igloo marketed the Recool as "the world's first eco sensitive cooler, made from 100% biodegradable materials." Vericool objected to Igloo's advertisements. Vericool informed Igloo that the claims were false because Vericool marketed the biodegradable Ohana cooler first.

Unable to resolve their differences, Vericool sued Igloo for false advertising under the Lanham Act, § 1125(a)(1)(B), and unfair competition under California Business and Professions Code § 17200 *et seq*. Vericool alleged Igloo falsely claimed the Recool was the first biodegradable cooler. This misrepresentation robbed Vericool of "the cachet that comes from producing a pioneering product." Without this "cachet," Vericool could not capitalize on the same media attention and free advertising Igloo had. The complaint quotes media coverage referring to the Ohana as "not the first of its species," "another alternative to Styrofoam coolers," and "much like the Igloo RECOOL

biodegradable cooler." Vericool pleaded that Igloo's advertising diminished the value of Vericool's "innovation" and "materially harmed" Vericool's ability to market the Vericool III and Ohana. Vericool also pleaded that "consumers . . . are more likely to purchase a product that is the 'first' of its kind rather than a secondary alternative." Vericool's complaint never alleged that consumers doubted that its products were biodegradable.

The lawsuit continued to discovery. One Vericool representative testified customers were likely to accuse Vericool of attempting to "knock off" Igloo's Recool. Vericool's CEO explained "that customers didn't believe that [Vericool was] the first," because they believed "Igloo was the first, and that [Vericool was] lying." Likewise, Vericool stated that "third party entities indicated they were less interested in Vericool's biodegradable coolers because Vericool was perceived as not being the innovator in the product category."

Vericool and Igloo cross-moved for summary judgment. Vericool moved for partial summary judgment, claiming that Igloo's statement damaged "its reputation and goodwill" based on the false perception they were selling a "knock off" product. Igloo moved for summary judgment because the "Lanham Act does not create a cause of action . . . to reward manufacturers for their innovation in creating a particular device." Thus, Igloo argued that its statements are not actionable because Vericool "has repeatedly confirmed that this case is about 'inventorship' of the biodegradable cooler."

The district court granted summary judgment for Igloo, holding that the Lanham Act does not support claims based on a defendant's false claims of "inventorship" over a

product. *Vericool World LLC v. Igloo Prods. Corp.*, 2023 WL 8634803, at \*3–4 (N.D. Cal. Dec. 13, 2023) (citing *Dastar Corp. v. 20th Century Fox Film Corp*., 539 U.S. 23 (2003); *Sybersound Records, Inc. v. UAV Corp*., 517 F.3d 1137 (9th Cir. 2008)). The district court reasoned that Vericool's claim was barred because it was about "the originality and novelty of its own cooler design." *Id.* at \*4. The district court thus did not allow the claim to proceed: "Plaintiff may not directly challenge the Recool as infringing its patents" so "it is trying to protect its intellectual property rights through the Lanham Act." *Id.* The district court dismissed the state-law claim as derivative of the Lanham Act claim. *Id.* at \*5. Vericool timely appealed.

II

We have appellate jurisdiction under 28 U.S.C. § 1291. Igloo argues that Vericool World cannot establish an injury in fact sufficient to establish Article III standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "In a false advertising suit, a plaintiff establishes Article III injury if some consumers who bought the defendant's product under a mistaken belief fostered by the defendant would have otherwise bought the plaintiff's product." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825 (9th Cir. 2011) (cleaned up). Igloo claims that Plaintiff Vericool lacks an Article III injury in fact because Vericool World was founded in 2021, years after the statements that allegedly injured Vericool Inc.

Vericool World has standing to sue as an assignee of Vericool Inc.'s injury. "[A]n assignee can sue based on his assignor's injuries" under Article III. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008). Vericool World acquired some of Vericool Inc.'s assets,

including the right to sell Vericool Inc.'s biodegradable coolers.   According to the asset purchase agreement, Vericool World acquired all "intellectual property," including patents, and "[t]rademarks, registered and non-registered names and logos," and all claims "against intellectual property" held by Vericool Inc.  The assignment of claims against intellectual property also assigns the unfair competition claim.  *See* Intellectual Property, Black's Law Dictionary (12th ed. 2024) (defining "intellectual property" to mean "[a] category of intangible rights" which "primarily" comprises "trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition").  Vericool World thus has Article III standing as an assignee of Vericool Inc.'s injury in fact.  *See Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 886–88 (9th Cir. 2005) (en banc).[2]

We review the district court's grant of summary judgment de novo.  *2-Bar Ranch Ltd. P'ship v. U.S. Forest Serv.*, 996 F.3d 984, 990 (9th Cir. 2021).  Viewing the evidence in the light most favorable to the nonmovant, we consider whether genuine issues of material fact exist and whether the district court correctly applied the substantive law.  *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1220 (9th Cir. 2008).

---

[2] Igloo also claims that Vericool's alleged interest is not in the zone of interest of the Lanham Act.  Although sometimes referred to as "Lanham Act standing," the zone of interest requirement simply asks whether there is "a cause of action under the statute."  *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 128 (2014).  Thus, it is not a jurisdictional requirement, and we can affirm summary judgment on the merits without resolving the issue.  *See City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686, 692 n.5 (9th Cir. 2015); *cf. TrafficSchool.com*, 653 F.3d at 825.

### III

The Lanham Act provides a cause of action against any person who makes false statements in "commercial advertising or promotion" that "misrepresent[] the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities." § 1125(a)(1)(B).  Vericool claims that Igloo made "false and misleading statements" regarding the nature, characteristics, and qualities of Vericool's Ohana cooler because Igloo falsely claimed its Recool cooler was "the 'first' biodegradable cooler."

We first consider whether the Lanham Act creates a cause of action for statements that wrongfully misrepresent the "first mover" on the market.  Finding that it does not, we then consider whether Vericool waived a new argument it makes on appeal: whether Igloo's statements confused consumers as to whether the Ohana cooler was genuinely biodegradable.

### A

### 1

We have never considered whether the date on which a product first reaches the market may count as a nature, characteristic, or quality under the Lanham Act.  Cases interpreting these terms create a dichotomy between Lanham Act claims based on ideas or design concepts embodied in a product and claims based on the nature, characteristics, and qualities of the product itself.  *See, e.g.*, *Sybersound*, 517 F.3d at 1144.  We hold that when a plaintiff brings a false advertising claim based purely on statements that cause confusion about which product was the first on the market,

that plaintiff does not have a valid claim under § 1125(a)(1)(B).

a

We are guided by a line of cases tracing the fuzzy boundaries between the laws of unfair competition and intellectual property. American law seldom prevents market competitors from harming each other, as fierce competition "is a fundamental premise of the free enterprise system." Restatement (Third) of Unfair Competition § 1 cmt. a (Am. L. Inst. 1995). The privilege of competing is not without limits, however. Common law courts developed causes of action to prevent false advertising and protect "a convenient, low-cost source of information that assists consumers" in choosing "among competing products." *Id*. § 1 cmt. d. These common law causes of action were not calibrated to protect the intellectual property behind the products themselves. *See Dastar*, 539 U.S. at 37.

Congress adopted the Lanham Act within this common law context. "Because of its inherently limited wording," the Lanham Act's unfair competition provision "can never be a federal codification of the overall law of unfair competition, but can apply only to certain unfair trade practices prohibited by its text." *Id.* at 29 (cleaned up). Thus, the Lanham Act "does not prohibit a broad range of acts defined as unfair competition by the law of many states." *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 792 (9th Cir. 1981). Section 1125(a) serves as the "Lanham Act's provision on unfair competition." *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 845 F.3d 1246, 1249 (9th Cir. 2017).

Yet the common law origins of the Lanham Act provide important context when interpreting the terms of § 1125(a).

*See Dastar*, 539 U.S. at 37. Although we have never considered a claim exactly analogous to Vericool's, we are guided by a line of cases starting with *Dastar*. There, the Supreme Court interpreted the meaning of another subsection of the Lanham Act—§ 1125(a)(1)(A). That provision creates a cause of action against any person who makes false statements in commerce which "cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods." § 1125(a)(1)(A).

In *Dastar*, the plaintiff claimed that the defendant improperly advertised itself as the producer of a video series that the plaintiff produced decades before. 539 U.S. at 26–27. The plaintiff's complaint stated that the defendant's sale of the videos "without proper credit" to the source of the original footage "constitute[d] reverse passing off in violation" of § 1125(a)(1)(A). *Id.* (cleaned up). The Court rejected this claim. It interpreted "the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations (which were not designed to protect originality or creativity), and in light of the copyright and patent laws (which were)." *Id.* at 37 (emphasis removed). The Court held that "the most natural understanding of the 'origin' of 'goods'" was "the producer of the tangible product sold in the marketplace," not the "person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.* at 31–32.

*Dastar* relied on the broader legal context in which Congress enacted the Lanham Act. Courts consider the "full context" of congressional enactments and read words to "mean what they conveyed to reasonable people at the time they were written." Antonin Scalia & Bryan A. Garner,

Reading Law 16 (2012). Consistent with this approach, *Dastar* suggests that reasonable people at the time of the Lanham Act's enactment knew the common law foundations of a tort for unfair competition. *Cf.* 539 U.S. at 37.

The Court distinguished between the Lanham Act and intellectual property law—a different area of law where "origin" can mean intellectual origin. *See id.* at 33, 37. Congress chose to protect creative inventions and expressions through copyright and patent law. *Id.* at 33–34. And "the rights of a patentee or copyright holder" under intellectual property law "are part of a 'carefully crafted bargain' . . . under which, once the patent or copyright monopoly has expired, the public may use the invention or work at will and without attribution." *Id.* (citation omitted). Courts must therefore avoid interpretations of the Lanham Act that extend "trademark and related protections into areas traditionally occupied by patent or copyright." *Id.* at 34.

We have held that *Dastar*'s analysis governs claims under § 1125(a)(1)(B), in addition to claims under § 1125(a)(1)(A). In *Sybersound*, we held that "the nature, characteristics, and qualities" of a product "are more properly construed to mean characteristics of the good itself." 517 F.3d at 1144. The *Sybersound* plaintiff sued a competitor in the karaoke record industry. The plaintiff alleged that the defendant made false claims to customers that the songs on the records it sold were fully licensed and that the defendant had paid royalties to the copyright holders. *Id.* at 1141–42. We held that the claim was not cognizable.

We gleaned two principles from *Dastar*. First, the textual terms in the Lanham Act do "not refer to the author of any idea, concept, or communication embodied in a good, but to the producer of the tangible good itself." *Id.* at 1144.

The "characteristics of the good itself" must be observable about the product itself, "such as the original song and artist of the karaoke recording, and the quality of its audio and visual effects." *Id.*

Second, courts must "avoid overlap between the Lanham and Copyright Acts" when interpreting the terms of the Lanham Act. *Id.* "Under copyright law, only copyright owners and exclusive licensees of copyright may enforce a copyright or a license." *Id.* Recognizing a cause of action under the Lanham Act, however, would allow a plaintiff who was not a copyright holder to bring suit. We declined to recognize a new cause of action that would serve as a loophole to the limits Congress placed on copyright law. *See id.*

Under *Sybersound*, § 1125(a)(1)(B) does not create a cause of action for misrepresentations about the source of a product's design characteristics. Vericool claims that Igloo misrepresented which product was the "first mover" in the market for biodegradable coolers. The question is whether this alleged misrepresentation concerns a design characteristic or a tangible characteristic. Despite our dissenting colleague's repeated assertion that we decide this question for the first time, our decision is informed by the analysis given by the Federal Circuit.[3]

In *Baden Sports, Inc. v. Molten USA, Inc*., the Federal Circuit applied *Sybersound* to hold that a plaintiff could not bring a cause of action under § 1125(a)(1)(B) when a competitor advertised that it was the "innovator" of a

---

[3] The Federal Circuit applies the law of the regional circuit for non-patent issues. *See Baden Sports, Inc. v. Molten USA, Inc*., 556 F.3d 1300, 1304 (Fed. Cir. 2009).

technology that the plaintiff claimed it authored. *See* 556 F.3d 1300, 1307 (Fed. Cir. 2009). Baden sued Molten for Molten's advertisement of its innovative "dual-cushion technology," a cushion layer placed underneath the outer layer of Molten basketballs. *Id.* at 1302–03. Baden patented and sold basketballs with its own "cushion control technology" at least six years before Molten advertised its "dual-cushion technology." *Id*. The district court allowed Baden's claim based on Molten's false claim that the technology was "'innovative'" to proceed to trial because the statements could "describe the 'nature, characteristics, or qualities of the basketballs themselves.'" *Id.* at 1303. Trial testimony established that "Molten's product was not 'new.'" *Id.* at 1307. Thus, the district court held that the statements misrepresented the innovativeness of the technology, establishing a cognizable claim under the Lanham Act. *See id.* at 1303.

The Federal Circuit reversed. It held that Baden could not "proceed with a false advertising claim that [was] fundamentally about the origin of an idea." *Id.* at 1308. If "innovation" or "newness" was an attribute under the Lanham Act, litigants could find a loophole around *Sybersound*. *See id.* "'Innovative' only indicated, at most, that its manufacturer created something new, or that the product is new, irrespective of who created it." *Id.* at 1307. But that is not enough to state a claim under the Lanham Act: "Baden's arguments in this case amount to an attempt to avoid the holding in *Dastar* by framing a claim based on false attribution of authorship as a misrepresentation of the nature, characteristics, and qualities of a good." *Id.*

We agree with this reasoning. A misrepresentation about attributes embodied in a physical product is actionable under the Lanham Act if it misleads a consumer about the quality

of a good itself or misrepresents the physical producer of a good in a manner that would be actionable under traditional claims for unfair competition. If, however, the misrepresentation regards "matters that are typically of no consequence to purchasers," such as the source of the idea, design, or innovation embodied in the product, then plaintiffs must bring an intellectual property claim and cannot proceed under the Lanham Act. *Dastar*, 539 U.S. at 33, 37.

b

Our dissenting colleague's objections do not disturb our conclusion that the *Dastar* line of cases controls this dispute. The dissent would have us ignore the principles established in these cases and instead be the first appellate court to adopt the broadest possible meaning of the text. *See* Dissent at 32. But the dissent's attempts to cabin every prior case to its facts are not availing. *Dastar*, *Sybersound*, and *Baden Sports* are not the one-off, fact-bound dispositions the dissent claims; each case examined the text and context to determine the extent to which the Lanham Act federally codifies common-law unfair competition claims while preserving the "carefully crafted bargain" of intellectual property law. *Dastar*, 539 U.S. at 33 (citation omitted). In any event, the dissent's novel approach to textual analysis fails on its own terms.

Start, as we must as an inferior court, with the Supreme Court's decision in *Dastar*. The dissent suggests we can limit its holding to § 1125(a)(1)(A). Even if that were consistent with the Supreme Court's reasoning, we would still be bound by the *Sybersound* panel's decision to apply the *Dastar* reasoning to § 1125(a)(1)(B). *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).

The dissent's distinction between § 1125(a)(1)(A) and § 1125(a)(1)(B) also fails on its own terms. The dissent argues that the partial federal codification of common-law claims is necessarily limited in § 1125(a)(1)(A), but that Congress—in the same paragraph—intended the broadest possible codification of common-law claims in § 1125(a)(1)(B).

This does not follow, and it is not enough to say that § 1125(a)(1)(A) can provide a cause of action for copyright infringement. The plaintiff's cause of action in *Dastar* was for reverse passing off. *See* 539 U.S. at 30. That is a tort in which a defendant misrepresents who manufactured a good; the plaintiff did not accuse Dastar of using its trademark. *See id.* Yet the Court held that when determining whether a § 1125(a) cause of action incorporates common-law claims, we must be careful to avoid rendering limits on intellectual property claims "superfluous." *Id.* at 35. That reasoning is not cause-of-action dependent—indeed, the Court cited subsection (a) without further specifying (1)(A).

And while the Court suggested in dicta that a plaintiff may have a cause of action under § 1125(a)(1)(B) if a defendant copies its video and advertises it as "quite different from" the original, *see id.* at 38, that does not mean the subsection allows claims based on the ideas contained in the goods. The Court still contemplated observable qualities, as a viewer could watch the scenes and narration and observe that they were the same. And there is no way to distort the dicta to support a workaround to *Dastar*'s core holding that a misrepresentation about the author of a copyrighted work is not actionable under the Lanham Act.

The dissent's disagreement with *Sybersound* fares little better. Everyone agrees that *Sybersound* held that plaintiffs

cannot use § 1125(a)(1)(B) as a workaround for limits placed on copyright-infringement claims, such as copyright standing. *See* Dissent at 40–41. But patent law also has limits, and allowing Vericool's claim would allow it to collect damages for infringement on an idea that is not patentable. As explained below, the idea for a biodegradable cooler is neither novel nor non-obvious. *See infra* at 23-24. The dissent never explains why we should allow Vericool to collect damages for infringement on this idea under false advertising law even though Congress has barred Vericool from collecting damages for infringement on the same idea under patent law.

That line is drawn in *Sybersound*'s "characteristic of the good itself" formulation. That test requires proof of something observable by the consumer—"such as the original song and artist of the karaoke recording, and the quality of its audio and visual effects"—to be cognizable under the Lanham Act. *Sybersound*, 517 F.3d at 1144. As explained above, these attributes remain within the scope of common-law claims for unfair trade practices, where the tortfeasor could misrepresent an observable quality.**[4]**

---

[4] The dissent's assertion that our holding will "confuse and wreak havoc in district courts," Dissent at 29; *see also id*. at 42–43, is overblown. In the two decades since *Dastar* and *Sybersound* were decided, district courts have found the line between barred claims about "'inventors' of certain products or technology" and claims based on the "nature of the[] goods" themselves. *See Lashify, Inc. v. Urb. Dollz LLC*, 2024 WL 3915093, at *5 (C.D. Cal. July 19, 2024); *see also Williams & Lake LLC v. Genesis Sys. LLC*, 2017 WL 6418937, at *8 (D. Ariz. Sept. 13, 2017). If anything, the dissent's crabbed reading of *Sybersound* is far more "difficult to administer," as it would require district courts to probe plaintiffs' motives to "plead around" restrictions in intellectual property law. Dissent at 40–43. Our holding avoids that problem by examining the objective statements to determine whether they relate to intellectual

Of course, our dissenting colleague has every right to believe binding cases are wrongly decided.  But there is a reason the dissent's reading battles every prior case.  Nothing in the plain text of the Lanham Act suggests that these courts erred in adopting something less than the broadest possible meaning of the text.  *Cf. Chevron USA Inc. v. Plaquemines Par.*, 2026 WL 1040461, at *6 (U.S. Apr. 17, 2026) ("But, generally in statutory interpretation, it is the ordinary, not literalist, meaning that is the better one." (cleaned up)).

The dissent's recitation of isolated dictionary definitions contributes little to finding the ordinary meaning of the terms of the Lanham Act.  "The ordinary meaning is not merely a *possible* meaning," and the fact that we could stretch statutory terms further does not mean that we should.  *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1129 (9th Cir. 2025) (R. Nelson, J., dissenting); *see also United States v. Burke*, 504 U.S. 229, 243 (1992) (Scalia, J., concurring in the judgment).  *Dastar* illustrates this.  Recall that *Dastar* interpreted the meaning of "origin" in § 1125(a)(1)(A), which the Court noted could encompass intellectual origin.  *See id.*  The dictionary was the starting point; from there, the Court considered context, noting that common-law claims for unfair competition and federal intellectual property law are distinct.  *Id.* at 33.  This was just good textual interpretation.  Ignoring context in textual interpretation can lead to contorted statutory interpretations.

---

features of goods or to qualities of the products themselves.  And no appellate judge has endorsed the dissent's alternative approach in the intervening two decades.  We generally avoid creating a circuit split if possible.  *See, e.g.*, *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987).

*See, e.g.*, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 661–62 (2020).

And while the dissent suggests that the grouping of the terms "nature," "characteristics," and "qualities" suggests "Congress chose to cover the field of possible misrepresentations," Dissent at 32, the dissent never grapples with the difficult question of which congressional enactment prevails when in conflict. "Congress does not hide elephants in mouseholes." *Washington v. United States Dep't of State*, 996 F.3d 552, 562 (9th Cir. 2021) (cleaned up). If Congress intended to undo detailed limitations on patent claims, it would have done so with more specificity than amorphous words such as "nature," "characteristics," and "qualities." *See Dastar*, 539 U.S. at 34.

Next, the dissent's objection that our conclusion ignores the textual neighbors "geographic origin" and "services" misconstrues our holding. Nothing about a product's "geographic origin" connotes the intellectual properties embedded in the product. The difference between a tangible geographic origin and an intellectual origin is a manageable distinction and the very distinction set forth in *Dastar*. 539 U.S. at 31–32. And even though consumers may not be able to physically hold a service, a consumer may still observe qualities of a service. Neither term supports the dissent's conclusion that Congress intended "nature," "characteristics," and "qualities" to include the ideas or designs embodied in goods or services.

Finally, the dissent contends that the Lanham Act's common law origin is broad enough to encompass claims based on misrepresentation that something is the "first to the market." The dissent cites two examples from the Restatement of Unfair Competition: misstatements as to

whether a product is patented, and misstatements as to whether something is "the original." Dissent at 35-36. The latter has little bearing here. Perhaps false claims of being the "original" may also state a claim for reverse passing off under § 1125(a)(1)(A) by causing confusion as to the actual "producer of the tangible product sold in the marketplace." *Dastar*, 539 U.S. at 31. As one district court explained, "it is plausible that such a claim to originality could sway a consumer . . . by intimating that these 'original' [products] are the ones the consumer remembers fondly from his childhood." *Conopco Inc. v. Wells Enters., Inc.*, 2015 WL 2330115, at \*5 (S.D.N.Y. May 14, 2015). Vericool does not contend that Igloo's statements caused consumers to believe that Vericool produced and sold the Recool, so we need not consider the issue further.

As to the former, we have already explained that the Lanham Act's unfair competition provision "can never be a federal codification of the overall law of unfair competition." *Dastar*, 539 U.S. at 29 (cleaned up). Here, because Congress chose to protect patents through a separate body of law, we doubt that this aspect of the common law is cognizable under the Lanham Act without a connection to the characteristics of the product itself. *See Sybersound*, 517 F.3d at 1144.[5]

---

[5] Contrary to the dissent's claim, the Federal Circuit's decision in *Crocs, Inc. v. Effervescent, Inc.*, supports this conclusion. 119 F.4th 1 (Fed. Cir. 2024). There, the court reaffirmed "that a false claim of origin, *and nothing more*, is a claim of authorship and does not give rise to a cause of action under" § 1125(a)(1)(A) or (B). *Id.* at 6 (emphasis added). The outcome there was different because the claimant alleged that a competitor "possesse[d] a patent on a product feature *and* advertise[d] that product feature in a manner that cause[d] consumers to be misled about the nature, characteristics, or qualities of its product." *Id*. at 2

While the dissent's textual interpretation is creative, that virtue does not save it from being wrong. An unbroken line of binding and persuasive authority establishes that the Lanham Act does not establish claims that are "fundamentally about the origin of an idea." *Baden Sports*, 556 F.3d at 1307. Thus, the only issue becomes whether Vericool's claim that it was the first to market a biodegradable cooler is about the origin of an idea.

2

Having established the proper legal framework, we apply it to the facts. The district court correctly held that Vericool's claim for the lost value of being the first to market a biodegradable cooler is not cognizable under the Lanham Act. Vericool claims that Igloo falsely advertised the Recool as "the world's first eco-friendly cooler" and the "first cooler made from 100% biodegradable materials." These statements may be false or misleading.

But to determine whether these statements "misrepresent[] the nature, characteristics, qualities, or geographic origin" of either the Recool or Ohana coolers, § 1125(a)(1)(B), we apply the two principles of *Sybersound*. The textual terms in the Lanham Act refer to "the tangible good itself" and not "the author of any idea, concept, or communication embodied in a good." *Sybersound*, 517 F.3d at 1144. Further, we "avoid overlap between" the Lanham Act and intellectual property law. *Id.*

Igloo's claim that the Recool was the "first" biodegradable product on the market is not inherently a

---

(emphasis added). As explained below, Vericool waived any argument that the claimed misstatements of authorship related to any characteristic or quality of the products. *See infra* at 24-27.

claim about the tangible characteristics of the cooler itself. No observable quality of the coolers suggests whether they are the first to be sold in the market. A consumer cannot determine whether a good is the first to the market without reference to additional knowledge about the market as a whole. Thus, such a statement—without more—is a statement about the "idea, concept, or communication embodied in those goods." *Dastar*, 539 U.S. at 37. And the mere date on which a seller finalized a design for a product or first marketed it is "typically of no consequence to purchasers" when deciding which product is their preferred choice. *Id.* at 32–33. "The consumer who buys a branded product does not automatically assume that the brand-name company is the same entity that came up with the idea for the product, or designed the product—and typically does not care whether it is." *Id.* at 32.

Vericool's own framing confirms the point. According to Vericool, advertising a product as the first on the market catches the attention of "customers who value eco-friendly and innovative products." But Vericool never claims that being the first to the market connotes a superior quality in the product itself; instead, Vericool claims damage to its "reputation and goodwill" and loss of free publicity. Unfair competition law protects consumers purchasing products, not the goodwill and positive publicity of competitors in the market. *See* Restatement (Third) of Unfair Competition § 1 cmt. d. Thus, when the Lanham Act is read "in accordance with the Act's common-law foundations," *Dastar*, 539 U.S. at 37, the innovativeness of a design cannot give rise to a claim for unfair competition, *see Baden Sports*, 556 F.3d at 1307 ("'Innovative' only indicates, at most, that its

manufacturer created something new, or that the product is new.").**6**

Vericool's claim based on statements claiming to be the first to the market also impermissibly seeks to vindicate an economic interest that patent law alone protects. Congress protected the economic interest of being a first mover through patent law—not the Lanham Act. That protection is intentionally limited. A patent must be broad enough to encourage innovation, while also being limited enough to avoid "a monopoly . . . upon so great an area in the field" as to impose "a serious restraint upon the advance of science and industry." *Joseph E. Seagram & Sons v. Marzall*, 180 F.2d 26, 28 (D.C. Cir. 1950).

To strike this balance, Congress authorizes patents only for inventions that are novel and non-obvious. *See* 35 U.S.C. §§ 102–103. This means that a claimant is not entitled to a patent if "the claimed invention was patented . . . before the effective filing date of the claimed invention." *Id.* § 102(a)(1). Nor is the claimant entitled to an extension of a prior patent when the extension is obvious "to a person having ordinary skill in the art to which the claimed

---

[6] The dissent contends that Igloo's statements implied the Ohana was a "knock-off" and therefore of inferior tangible quality. Dissent at 43. But this conflates two meanings of "quality." The dissent's argument relies on the inference that a product derived from someone else's idea is less desirable and thus of inferior value. From there, the dissent chains together the added inference that inferior value connotes an observable characteristic. But while both inferences could be true, neither is necessarily true. As discussed below, Vericool has no evidence that Igloo's statements suggested that the Ohana was made of different materials, performs worse, or is less biodegradable than the Recool. *See infra* at 25.

invention pertains." *Id.* § 103; *see also Incept LLC v. Palette Life Scis., Inc.*, 77 F.4th 1366, 1371 (Fed. Cir. 2023).

Vericool applied for a patent on its biodegradable cooler. The U.S. Patent and Trademark Office (PTO) rejected many claims in the application. The PTO found a prior 1923 patent application for a "thermally insulating packaging comprising a solid compostable or recyclable shell that is formed primarily of a plant fiber." And the PTO found many of Vericool's designs for how to mold the cooler obvious to a person of ordinary skill. Vericool now attempts to use the Lanham Act as an end run around the PTO's decision. It cannot do so. *See Dastar*, 539 U.S. at 33–34. If Congress had intended to protect the economic value of inventing the general concept of a biodegradable cooler, it would have done so "with much more specificity than the Lanham Act's ambiguous use," *id*. at 34, of the terms nature, characteristic, and quality.

In sum, Vericool's "first to the market" claim is fundamentally a claim about origins of a design rather than the tangible characteristics of the cooler itself. Such claims improperly circumvent the limits Congress placed on patent protection. Thus, Vericool's Lanham Act claim fails as a matter of law.

B

Vericool asserts for the first time on appeal that Igloo's "first to the market" claim caused confusion about whether the Ohana was biodegradable. According to Vericool, "one justifiable inference" of Igloo's claims to be the first to the market "is that Vericool's already existing coolers" were not biodegradable. While this inference might relate to a tangible characteristic of the cooler, Vericool waived this argument.

Vericool has not offered evidence suggesting Igloo's statements caused or are likely to cause customers to doubt that the Ohana was genuinely biodegradable. Nor did Vericool present this theory to the district court. From the complaint onwards, Vericool has presented claims to recapture the market attention that comes from selling a product as the first of its kind "rather than a secondary alternative." Vericool presented evidence that Igloo caused confusion about whether the Ohana was a "knock off" of Igloo's Recool. Vericool's summary judgment briefing contradicts the argument that customers doubted that the Ohana was biodegradable. Vericool quoted media statements that advertised the Ohana as "another alternative to Styrofoam coolers," a part of the "growing biodegradable cooler market," and joining "the ranks of biodegradable, post-consumer-recycled, disposable coolers." Far from showing confusion as to whether the Ohana was biodegradable, these statements confirm that it was biodegradable and was recognized as such.

Thus, Vericool waived issues relating to confusion about whether the Ohana was biodegradable. *See, e.g.*, *Int'l Union of Bricklayers & Allied Craftsman Loc. Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985) ("We will not, however, review an issue not raised below unless necessary to prevent manifest injustice.").

Vericool claims that this is a new argument rather than a new issue. That cannot be. Vericool's new theory fundamentally transforms the nature of Vericool's claim and requires quite different evidence to support it as a matter of fact. A misrepresentation about whether a product is biodegradable likely would misrepresent a tangible characteristic under the Lanham Act. Whether a product can break down through natural processes is a tangible quality

that consumers can observe through the product's use or through testing the product's materials. *Cf. Biodegradable*, *Merriam-Webster's Collegiate Dictionary*, 123 (11th ed. 2003) (defining "biodegradable"). It is likely one of the "characteristics of the good itself." *Sybersound*, 517 F.3d at 1144.

We assume that a statement that a product is the first with a certain characteristic might be understood by consumers as implying something regarding the good itself. Perhaps a customer already familiar with one biodegradable product may, upon seeing another advertised as the first, question whether the original was genuinely biodegradable. That was the Federal Circuit's reasoning in *Crocs*. The court stressed that "the false claim that a product [was] patented [did] not stand alone." *Crocs, Inc.*, 119 F.4th at 6. The claimant there pleaded that the false patent claim "misled current and potential customers to believe" that the product was "made of a material that is different than any other footwear," *id.* at 3, and offered evidence in support, *id.* at 6. Likewise, at least one district court in our circuit has considered evidence of this type of consumer confusion. *See Suzie's Brewery Co. v. Anheuser-Busch Cos.*, 519 F. Supp. 3d 839, 853 (D. Or. 2021).

Thus, under Vericool's new theory, its Lanham Act claim might be cognizable. Based on the evidence and legal arguments Vericool presented below, however, it is not. That is a problem for Vericool; its different theories required factual support with different evidence at summary judgment. The legal theory that Igloo implied that the Ohana was not biodegradable required evidence that customers were at least likely to have been confused on that point. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). By contrast, Vericool presented

evidence supporting the legal theory that confusion existed about which cooler was the first.  This evidence showed that media and marketers got all the facts right except one: which cooler came first.  "[A]ppellants may not upset an adverse summary judgment by raising an issue of fact on appeal that was not plainly disclosed as a genuine issue before the trial court."  *Int'l Union of Bricklayers*, 752 F.2d at 1404.[7]

Because Vericool waived its only potentially viable claim, we affirm the district court's grant of summary judgment.[8]

IV

Being first to the market carries some economic value.  Congress chose to protect the value of being first through the Patent Act.  But Vericool's claim is not cognizable under the Lanham Act.

**AFFIRMED.**

---

BUMATAY, Circuit Judge, dissenting:

---

[7] Even if this were an argument rather than a claim, Dissent at 43–44, we would still affirm summary judgment for Igloo because Vericool failed to present evidence supporting this theory at summary judgment.  *See Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) ("[W]e may affirm based on any ground supported by the record.").  Neither Vericool nor the dissent cites evidence in the record that would create a genuine issue of material fact on this issue.

[8] Vericool concedes that our analysis of the Lanham Act claim controls the disposition of the California state-law claim.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.").

The question of what is the "nature" of a thing has vexed philosophers, physicists, and poets for millennia.  Take the Ship of Theseus.  Plutarch famously recounts the fate of Theseus's ship after the hero returned from his epic voyage.  According to Plutarch, the ship was preserved by the Athenians for centuries—a testament to its navigator.  *See* Plutarch, *Theseus*, in 1 Lives 1, 49 (Loeb Classical Liberty 1914) (trans. Bernadotte Perrin).  But over time, the Athenians had to replace the ship's timbers as they fell into disrepair—plank by plank.  Eventually, the ship was composed entirely of new wooden planks—stripped of any original wood.  The critical question—what was the nature of the preserved vessel?  Was it *still* the Ship of Theseus?  Or was it a new ship—a replica of the original?  At the heart of this thought experiment is whether something can be more than its tangible parts.  Thankfully, we don't need to settle this age-old question here.  Instead, our job is simply to answer whether the "nature," "characteristics," or "qualities" of a thing includes its *intangible* nature, characteristics, or qualities.  Under the plain meaning of those words, the answer is of course "yes."

So when Vericool World manufactured what it considered to be the first biodegradable cooler and then sued Igloo Products for falsely advertising that Igloo created the original biodegradable cooler, Vericool alleged a material misrepresentation under the Lanham Act.  Under § 43(a)(1)(B) of the Act, misrepresentations going to "the nature, characteristics, [or] qualities" of "goods, services, or commercial activities" are actionable for false advertising. 15 U.S.C. § 1125(a)(1)(B).  And whether something is "the first of its kind" is a distinctive historical feature.  So, like the identity of the Ship of Theseus, whether Vericool's cooler was the first or the original goes to its nature,

characteristics, or qualities. Indeed, according to Vericool, Igloo's allegedly false assertions imply that its cooler was an imitation or "knockoff" of Igloo's.

Fighting this plain-text reading, the majority offers a novel interpretation categorically limiting § 43(a)(1)(B) to apply only to misrepresentations about *observable* "nature, characteristics, [or] qualities." Based on a misreading of precedent, the majority declares, for the first time, that a "'characteristic' must be an observable aspect of the 'tangible product'" to be cognizable under the Lanham Act. Maj. Op. 4 (simplified). Declaring that misrepresentations about non-observable, intangible characteristics "are typically of no consequence to purchasers," the majority holds that lies about "the source of the idea, design, or innovation" of a product can't be sanctioned under § 43(a)(1)(B) of the Lanham Act. *Id.* at 15 (simplified). So, to the majority, companies are free to mislead the public so long as the misrepresentation goes to intangible characteristics, like a product's origin, source, production, or other non-observable features. In short, the majority now exempts misrepresentations about a product's "ideas," "design concepts," or other intangible features from the Lanham Act's reach. *Id.* at 9.

But there's at least three problems with the majority's analysis. First, it can't be squared with the Lanham Act's plain text. Neither "tangible" nor "observable" characteristics appear in § 43(a)(1)(B)'s text. And the majority's carveout for misrepresentations about a product's "ideas or design concepts" is made from whole cloth. Second, the majority's newfangled "dichotomy" between misrepresentations about a product's "ideas or design concepts" and a product's tangible characteristics will confuse and wreak havoc in district courts. *Id.* Deciding

what's a "design concept" versus an observable characteristic will spark endless litigation. And finally, even accepting the majority's novel test, Vericool's allegation that Igloo's misrepresentations imply that its product is a "knockoff" is *tangible* enough to survive summary judgment.

Because the Lanham Act protects against false advertising about *all* types of "characteristics"—not just tangible or observable ones—I respectfully dissent.

## I.

### A.

> Section 43(a)(1)(B) of the Lanham Act provides that,
>
> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which—
>
> (B) in commercial advertising or promotion, misrepresents the *nature, characteristics, qualities*, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added). As we've said about the prior version of the Lanham Act, "[f]alse statements of fact in a defendant's advertising concerning his product fit comfortably within the language of section

43(a)."  *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1161 (9th Cir. 1982).

First, start with the obvious.  The text itself doesn't limit misrepresentations to a product's tangible or observable "nature, characteristics, [or] qualities."  15 U.S.C. § 1125(a)(1)(B).  The words "tangible" and "observable" appear nowhere in § 43(a)(1)(B).

Second, to understand the scope of the provision, define "nature," "characteristics," and "qualities."  None of these terms are limited to only *tangible* or *observable* features.  Nor do these terms definitionally exclude "design concepts" or "ideas" from their meaning.

"Nature" refers to the "distinguishing qualities or properties of something."  Webster's Third New Int'l Dictionary (ed. 1993); *see also* Random House Dictionary of the English Language (2d ed. 1987) ("character, kind, sort"); Black's Law Dictionary (6th ed. 1990) ("A kind, sort, type, order; general character.").  Thus, the "nature" of a commercial good marks its distinguishing qualities or features—and those distinguishing qualities are not limited to its physical attributes.  For example, when a product reached the market is a "distinguishing quality."

"Characteristic" means a "trait, quality, or property . . . distinguishing an individual, group, or type."  Webster's Third; *see also* Webster's New World College Dictionary (3d ed. 1988) (a "distinguishing trait, feature, or quality; peculiarity"); Merriam-Webster's Collegiate Dictionary (10th ed. 1994) ("a distinguishing trait, quality, or property").  Again, nothing in the meaning of "characteristic" focuses solely on its observable or tangible qualities.  And a product's "traits," "qualities," or "properties" could include its "design concepts."

And "quality" imputes a "special or distinguishing attribute"—a "distinctive inherent feature[.]" Webster's Third; *see also* Random House ("essential or distinctive characteristic, property, attribute"); Webster's New World College Dictionary ("any of the features that make something what it is; characteristic element, attribute"). Thus, the "quality" of a thing can refer to its observable *or* non-observable attributes.

Third, consider the words together. Notice that the words have similar meanings. In fact, each definition incorporates another term from the list. Why might Congress use all these overlapping words together? To "[o]rdinary users of the English language," *Nat'l TPS All. v. Noem*, 169 F.4th 796, 800 (9th Cir. 2026) (Bumatay, J., dissenting), the answer is to give the trio a broad meaning. By grouping the general terms "nature," "characteristics," and "qualities" together, Congress chose to cover the field of possible misrepresentations about goods and services broadly. Each term is self-reinforcing. Call it "belt and suspenders." The idea is that legislators often "use redundant terms to make sure that every possibility is covered." *United States v. Carona*, 660 F.3d 360, 369 (9th Cir. 2011). Also helpful is the idea that general words "are to be accorded their full and fair scope" and not "be arbitrarily limited." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 101 (2012). Thus, a plain reading of text shows that *all* misrepresentations about a good's distinctive properties fall within the Lanham Act's scope. We can't arbitrarily limit the provision to just *observable* features.

Fourth, "look to [the provision's] surrounding words." *Dubin v. United States*, 599 U.S. 110, 120 (2023). And the provision's "linguistic and statutory context" confirms that

nature, characteristics, and qualities can't be arbitrarily limited to only a product's tangible features. *Id.* (simplified). Consider the words' neighboring text. Congress grouped the trio of "nature," "characteristics," and "qualities" together with "geographic origin." 15 U.S.C. § 1125(a)(1)(B). And a false claim about "geographic origin" generally has nothing to do with a good's tangible or observable features. Take the example of two widgets—one made in California and one made in New York. Imagine that the two widgets are identical in every way. If the New York manufacturer claims its widget was made in California, then that's a misrepresentation about "geographic origin"—even if there is no impact on the widget's tangible properties. So if "geographic origin" can pertain to intangible properties, why arbitrarily limit "nature," "characteristics," and "qualities" to only tangible properties? If anything, "geographic origin" is similar to the product's "idea" or "design concept" that the majority seeks to exclude from the Lanham Act's reach.

Consider too that "nature," "characteristics," and "qualities" apply to "services" and "commercial activities" as well as to "goods." *Id.* A "service" is, by definition, "an act giving assistance or advantage to another," Webster's New World College Dictionary—often a "useful labor that does not produce a tangible commodity," Webster's Third. So a service is often intangible. Services can't always be reduced to their physical manifestations. Thus, limiting § 43(a)(1)(B) to only tangible or observable characteristics makes little sense when applied to services because services don't always come with tangible or observable parts. Think about it. If a company lied and said that Albert Einstein invented its physics-tutoring service, that would be a "characteristic" of the service—but not a tangible or observable one. Although whether Einstein invented a

service may be relevant to users of the service, under the majority's reading, that lie is fine because it deals with the "origin" or history of the "service"—rather than its observable aspects. Limiting § 43(a)(1)(B) to only *tangible* or *observable* characteristics thus carves out various misrepresentations from the Lanham Act's reach when it comes to services. The same goes for "commercial activities," which also aren't always tangible. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271–72 (10th Cir. 2000) ("[T]he plain language meaning of ["commercial activities"] encompasses 'commercial transactions' or all activities surrounding the peculiar 'commerce' of a company[.]").

Finally, look to the Lanham "Act's common-law foundations." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) (interpreting the Lanham Act considering the common law of unfair competition). Section 43(a)(1)(B) creates a federal cause of action for common-law "false advertising." *See* 4 McCarthy on Trademarks and Unfair Competition § 27:9 (5th ed. 2025). At common law, false advertising is established when "a seller falsely advertises that his product has qualities which in fact it does not have, but which products of other sellers do in fact possess." *Id.* § 27:1. Thus, the common law of false advertising applied broadly to *all* material misrepresentations—regardless of whether the misleading statement went to tangible or intangible features of a product.

> Material representations commonly take the form of statements that pertain directly to the quality or characteristics of the actor's goods or services, such as a representation that a

piece of jewelry is made of solid gold or that
a particular medical preparation will prevent
baldness. However*, a representation that
only indirectly relates to product quality or
that in some other manner relates to the
desirability of the proposed transaction may
also be material*. Representations that
concern matters that are trivial or of little or
no significance to prospective purchasers are
not material under the rule of this Section.

Restatement (Third) of Unfair Competition § 3 cmt. c (A.L.I.
1995) (emphasis added). Under the common law, then, if
the misrepresentation related in some way to the product's
quality or desirability, it would be actionable. Indeed, many
of the prototypical examples of false advertising involve
intangible qualities, including misleading statements about
the product's "source" or "origin"—

- *A*, a manufacturer of wrenches, refers in
  its advertising to the "patented design" of
  the product. The product is not in fact
  covered by any patent. If prospective
  purchasers, because of an assumed
  relationship between patents and product
  quality, are likely to attach importance to
  the existence of a patent, the
  representation is material. *Id.* § 3 ill. 3.

- *A*, a cereal company, manufactures by
  means of a patented process a breakfast
  cereal that it sells under the generic name
  "shredded wheat." Upon expiration of
  the patent, *B* begins to manufacture the

> same product, which it sells in packages similar in appearance to *A*'s and which prominently display the words "The Original Shredded Wheat." *B* is subject to liability to *A*. *Id.* § 4 ill. 2.

Thus, the Act's common-law foundation and plain text align—material misrepresentations can include any type of characteristic, including the product's provenance.

Given its plain text and common-law background, the Lanham Act encompasses misrepresentations about a good's tangible and intangible features. Nothing in its text limits § 43(a)(1)(B) to only *tangible* or *observable* properties, as the majority holds. Since "nature, characteristics, [and] qualities" are capacious terms that refer to any material distinction, § 43(a)(1)(B) must apply to a false claim that a biodegradable cooler is, as a historical fact, "the first of its kind." After all, purchasers may want to reward innovators in environmentally friendly production—so the identity of the first producer may be material. *See* Joseph P. Bauer, *A Federal Law of Unfair Competition: What Should Be the Reach of Section 43(a) of the Lanham Act?*, 31 UCLA L. Rev. 671, 743 (1984) ("[F]alse claims about the goods' uniqueness . . . are often . . . important to the consumer, and have [a] likelihood of injuring both consumer and competitor[.]".). At the very least, they may want to know if a product is a "knockoff" or imitation.

Thus, as a matter of text, Vericool's allegation that Igloo misrepresented that its biodegradable cooler was the first to market fits within the Lanham Act's scope.

## B.

Instead of following this plain-text reading of § 43(a)(1)(B), my friends in the majority take the wrong lessons from precedent to create a new, categorical *"observable-characteristics only"* rule. Relying on *Dastar*, the majority limits the meaning of "nature, characteristics, [and] qualities" to only "observable aspect[s] of the tangible product." Maj. Op. 4. To the majority, we must divide Lanham Act claims between misrepresentations about a product's "ideas or design concepts" and misrepresentations about a product's "observable" nature, characteristics, and qualities. *Id.* at 9, 13. And any misrepresentations related to a product's non-observable "design characteristics" categorically fall outside the scope of the Lanham Act. *Id.* at 13. But that's all wrong.

In essence, the majority relies on Supreme Court precedent dealing with *different* text in a *different* subparagraph of the Lanham Act with a *different* purpose to arbitrarily limit the plain text of § 43(a)(1)(B). In *Dastar*, the Supreme Court addressed "what § 43(a)(1)(A) of the Lanham Act means by the 'origin' of 'goods.'" 539 U.S. at 31. So from the start, that should tip you off that *Dastar* doesn't govern this case. The words and purpose of § 43(a)(1)(A) are different than § 43(a)(1)(B). Section 43(a) of the Lanham Act encompasses "two major and distinct types of 'unfair competition': (1) infringement of even unregistered marks, names and trade dress, and (2) 'false advertising.'" 4 McCarthy on Trademarks and Unfair Competition § 27:9 (5th ed.). Section 43(a)(1)(A) represents the "infringement of unregistered mark[s]" side of the Lanham Act, while, as stated earlier, § 43(a)(1)(B) encompasses the common-law "[f]alse advertising" prong of the Act. *Id.*; *see also Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 122 (2014) ("Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."). Reflecting this, § 43(a)(1)(A) focuses on "like[lihood] of confusion"—a traditional intellectual-property concern. 15 U.S.C. § 1125(a)(1)(A). On the other hand, § 43(a)(1)(B) is more broadly about "misrepresent[ations]"—as fits its false-advertising roots. *Id.* § 1125(a)(1)(B). While the two concepts overlap at times, the two claims must remain "separate and distinct and have different elements needed to assert a prima facie case." 4 McCarthy on Trademarks § 27:9.50. And so any discussion of § 43(a)(1)(A) doesn't map directly onto § 43(a)(1)(B).

*Dastar* thus dealt with interpreting the "federal cause of action for traditional trademark infringement of unregistered marks" under § 43(a)(1)(A)—not false advertising under § 43(a)(1)(B) as here. 539 U.S. at 30. That's why *Dastar* extensively discusses copyrights, trademarks, and patents—narrower IP concerns not coextensive with broader false-advertising concerns. And in the realm of trademark infringement, of course, it makes sense not to interpret "the Lanham Act to conflict with the law of copyright, which addresses th[e] subject [of communicative products] specifically." *Id.* at 33. So the Court read the phrase "origin of goods" narrowly as "the producer of the tangible product sold in the marketplace"—not "the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.* at 31–32. That's because reading the phrase expansively would allow producers to "misuse or over-exten[d] trademark and related protections into areas traditionally occupied by patent or copyright." *Id.* at 33–34.

So while we must follow what the Supreme Court says, *Dastar* didn't say much about the "false advertising" prong of the Lanham Act.   Indeed, its only mention of § 43(a)(1)(B) in no way suggests that a misrepresentation must only go to the product's tangible characteristics. Instead, the Court gave an example—if "the producer of a video that substantially copied [a television] series were, in advertising or promotion, to give purchasers the impression that the video was quite different from that series," then the producer would be liable for "misrepresentation under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)." *Id.* at 38.  All the Court required for the misrepresentation was a misleading claim that the product was "different" than the original in *some way*—it didn't limit those differences to only *tangible* or *observable* features.

Thus, the majority goes astray by trying to put *Dastar*'s square peg into the round hole of a Lanham Act false-advertising claim.   It follows *Dastar*'s infringement terminology without recognizing that this is a false-advertising claim.  That's why the majority employs ill-fitting descriptions of a product's characteristics—setting a dichotomy between "design" characteristics and "observable" characteristics.  Maj. Op. 9, 13.  But those two categories aren't mutually exclusive.  That's why, rather than using § 43(a)(1)(B)'s "misrepresentation" standard, the majority uses § 43(a)(1)(A)'s "confusion" standard.  *See id*. All of this is the language of intellectual property—not of false advertising.   Section 43(a)(1)(B) is concerned with policing outright lies in advertising and commercial promotion—not confusion between intellectual properties. So the majority looked to the wrong "common-law foundations." *Dastar*, 539 U.S. at 37.  That's why it missed

that false advertising, as a matter of common law, reaches *any* material misrepresentations, including those involving a good's non-physical characteristics. *See* Restatement (Third) of Unfair Competition § 3.

Nor does our precedent in *Sybersound Records, Inc. v. UAV Corporation*, 517 F.3d 1137, 1144 (9th Cir. 2008), compel the majority's rule either. *Sybersound* dealt with a specific problem—misusing a false-advertising claim to plead around the requirements of a copyright claim. As noted, "[s]ome plaintiffs have attempted to avoid a Lanham Act § 43(a)(1)(A) trademark infringement and unfair competition allegation by asserting that the same facts establish a claim of false advertising under § 43 (a)(1)(B)." 4 McCarthy on Trademarks and Unfair Competition § 27:9.50 (5th ed.). "The usual aim of this improper pleading is to avoid having to prove the validity of a trademark by claiming it is some new type of false advertising." *Id.* But "[a] plaintiff cannot disguise a § 43(a)(1)(A) trademark infringement claim as a false advertising § 43(a)(1)(B) claim." *Id.* This was the narrow problem we resolved in *Sybersound*. *See* 517 F.3d at 1141 ("In this appeal, we determine whether a party lacking standing to bring a copyright infringement suit under the Copyright Act, but who complains of competitive injury stemming from acts of alleged infringement, may bring a Lanham Act claim[.]"). There, we said that § 43(a)(1)(B) doesn't cover "misrepresentations about copyright licensing status" because that would conflict with copyright law. *Id.* at 1144. That's because allowing the plaintiffs there to proceed with the false-advertising claim would allow them to "litigate [an] underlying copyright infringement when they ha[d] no standing to do so." *Id.* So plaintiffs can't litigate "misrepresentations about copyright licensing

status" under § 43(a)(1)(B) of the Lanham Act. *Id.* But otherwise, we held that "nature, characteristics, and qualities" under § 43(a)(1)(B) just means "characteristics of the good itself." *Id.*

So *Sybersound* in no way limits a "characteristic" to only tangible or observable properties. If an intangible or non-observable feature goes to the "characteristics of the good itself," then it's fairly encompassed within § 43(a)(1)(B). *Id.* Indeed, we even suggested that the intangible origin of a product, such as who was the "original . . . artist" of a karaoke recording, was an actionable "characteristic." *Id.* And who originated a karaoke song does not affect the recording's tangible or observable characteristics. Instead, the original artist of a karaoke song is a characteristic like who was first to market a biodegradable cooler. *Sybersound* thus aligns with allowing a "first of its kind" claim.

So the majority's interpretation of *Sybersound* here is a major expansion of that precedent. And our duty is to follow the law as Congress enacted it, "not [to] extend precedent." *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Loc. 229* 974 F.3d 1106, 1116 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc). We certainly don't have a duty to extend out-of-circuit precedent. Yet the majority relies heavily on the Federal Circuit's interpretation of the Lanham Act in *Baden Sports, Inc. v. Molten USA, Inc.*, 556 F.3d 1300 (Fed. Cir. 2009) for its new rule.

And the majority's concern about overlap with patent law is misplaced. Vericool isn't asserting a violation of its patent over biodegradable coolers or that Igloo falsely holds itself out as having patented the cooler. Vericool only asserts that, as a matter of historical fact, it was the first to

manufacture the coolers.  That is much narrower than what a patent claim would require.  *See Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (simplified) (receiving Patent Act's protection requires claimed invention to satisfy all "the conditions and requirements of" the Patent Act, including "that the invention be novel, see § 102, nonobvious, see § 103, and fully and particularly described, see § 112").  Just because a "first to the market" claim might affect one element of a patent claim—its novelty—isn't enough for judges to arbitrarily limit the words that Congress chose.  So whether Igloo's or Vericool's product was first as a historical matter should be a matter for the jury.

Ultimately, the majority's atextual "observable-characteristics only" test will be difficult to administer.  Confusion surrounds what the majority means by "observable aspect[s] of the tangible product."  Maj. Op. 4 (simplified).  Further confusion surrounds what "ideas or design concepts embodied in a product" are excluded from the Lanham Act's protection against misrepresentations.  Maj. Op. 9.  *Sybersound* excluded only one narrow type of misrepresentation—"misrepresentations about copyright licensing status."  517 F.3d at 1144.  But the majority's rule is much broader and without proper guardrails.  It doesn't take much imagination to foresee cases where policing the line between tangible or observable characteristics and "design concepts" will prove difficult.  Take a claim that a product is made of "patented" material.  It implicates the product's idea or design concepts, which the majority wants to exclude.  But it could also implicate the product's "nature, characteristics, or qualities[.]"  *See Crocs, Inc. v. Effervescent, Inc.*, 119 F.4th 1, 6 (Fed. Cir. 2024) (concluding that a false claim that a product is "patented"

could be "directed to the nature, characteristics, or qualities" of a product).

Finally, highlighting the confusion around the majority's newfound "observable-characteristics only" test, I don't see why Vericool doesn't meet it.  As the majority concedes, Vericool asserts that Igloo's advertising caused confusion that its cooler was a "knock off" of Igloo's cooler.  Maj. Op. 6.  That would mean that purchasers understood Vericool's cooler to be a mere imitation or copy of the biodegradable materials in Igloo's cooler.  Whether something is an imitation or copy of another thing seems potentially "observable" to me.  Whether one product came to the market after another product could be an "observable aspect of the 'tangible product.'"  Maj. Op. 4.  And usually a "knock off" is considered a cheaper version of the original—again, potentially a tangible or observable characteristic.  *See* Knock-Off, Merriam-Webster's Collegiate Dictionary (11th ed. 2020) ("a copy that sells for less than the original"). Given that we must construe all inferences in Vericool's favor, this all means that Vericool has properly asserted that Igloo's alleged misrepresentations go to the Vericool coolers' tangible or observable qualities.

## II.

Because Vericool adequately alleged a material misrepresentation under the Lanham Act based on its "first of its kind" assertion, we should have remanded to the district court to determine whether Vericool meets the other elements of a false advertising claim.

Thus, I don't need to reach Vericool's other argument that Igloo's advertising also suggests that Vericool's cooler wasn't made of biodegradable materials.  After all, if Igloo says its cooler is the first biodegradable one, the obvious

inference is that anything before its cooler is not. That allegation of false advertising meets the Lanham Act standard even under the majority's strained "observable-characteristics only" reading. I will say, however, that the majority is wrong to treat the argument as waived. As I've said, "it is claims that are deemed waived or forfeited, not arguments." *Coal. on Homelessness v. City & Cnty. of San Francisco*, 90 F.4th 975, 999 (9th Cir.) (Bumatay, J., dissenting), *opinion withdrawn,* 106 F.4th 931 (9th Cir. 2024) (simplified). Vericool "can make any argument in support of its claims on appeal—it is 'not limited to the precise arguments [it] made below.'" *Id.* (simplified).

I respectfully dissent.